June 6, 2008

*Via ECF*
Hon. Joseph C. Spero
United States District Court
Northern District of California
Courtroom A, 15th Floor
450 Golden Gate Ave.
San Francisco, CA 94102

> Re:     *Sterling Merchandising, Inc. v. Dreyer's Grand Ice Cream, Inc.,*
>         USDC Case No. 08-80108 SBA (JCS)
>         File No. 080369-0001

Dear Judge Spero:

After conducting an in-person meet and confer and failing to reach an agreement, the parties submit this Joint Letter pursuant to the Stipulation and Order Modifying May 19, 2008 Order (Docket No. 6) regarding Respondent Dreyer's Grand Ice Cream, Inc.'s (Dreyer's) compliance with one remaining specification of Petitioner Sterling Merchandising, Inc.'s (Sterling) Subpoena for market studies documents and related deposition topics.

**Petitioner Sterling's Position**

> **Background and Matters that Remain in Dispute**

On January 5, 2006, Sterling, an ice cream distributor located in San Juan, Puerto Rico, filed a complaint against Nestlé S.A. and its Puerto Rican subsidiaries, Nestlé P.R. and Payco Foods Corporation. The Amended Complaint alleges that defendants used anti-competitive practices to attempt to monopolize ice cream distribution in Puerto Rico in violation of antitrust laws. *See* Exhibit A.

Sterling is the exclusive Puerto Rican distributor for Edy's brand ice cream which is manufactured by Dreyer's, the respondent in this matter. In 2003, Nestlé S.A., through its subsidiaries, acquired an ownership interest in Dreyer's and obtained complete ownership as of January 18, 2006. The Amended Complaint alleges that Dreyer's unfairly raised the price of Edy's to Sterling after Nestlé S.A. acquired ownership in Dreyer's. *See id.* at ¶¶ 34, 35.

On August 29, 2007, Sterling served Dreyer's counsel with an Amended Subpoena pursuant to Fed. R. Civ. P. 30(b)(2)(B) & (C),[1] which included, *inter alia*, Request No. 5 for "market research reports or analysis." *See* Exhibit B. To date, despite Sterling's repeated informal requests, Dreyer's has not complied with this document request.[2] Dreyer's designated

---

[1] Dreyer's counsel in this matter also represents Nestlé S.A. and other Nestlé affiliate defendants in the litigation pending in Puerto Rico.

[2] Sterling's Notice of Motion and Motion to Compel concerned compliance with Document Request Nos. 5 and 6 and related deposition topics. Counsel reached a compromise regarding Request No. 6 on May 28, 2008.

Letter to Hon. Joseph C. Spero
June 6, 2008
Page 2

William Collette as its deponent for this deposition, and Sterling deposed Mr. Collette on November 14, 2007. Mr. Collette provided limited information falling under topics regarding market research reports or analysis, but did testify that Dreyer's had undertaken customer behavior, price elasticity, and brand loyalty studies. *See* Exhibit C (Collette November 14, 2007 Depo. Tr. at 25-26; 103-08).

### Parties' Meet and Confer Efforts to Resolve this Dispute

Counsel for Sterling and Dreyer's have met and conferred to resolve this matter on August 16 and August 28, 2007, March 27, 2008 and April 11, 2008 but failed to reach an agreement. After this Court's May 23, 2008 Order, Sterling proposed that lead counsel meet and confer by telephone to attempt to resolve pending issues. On May 28 and May 29, 2008, counsel met and conferred via telephone and exchanged emails, copies of which are enclosed as Exhibit D. While counsel resolved one issue, no agreement was reached regarding Document Request No. 5. On May 30, 2008, counsel met and conferred in person in Madison, Wisconsin, but were unable to resolve the dispute at that time.

### Sterling's Position and Proposed Resolution

Dreyer's produced four pages with Puerto Rico market share data responsive to Request No. 5, claming that non-Puerto Rico specific documents were beyond the scope of Sterling's claims, not relevant to this litigation, and unduly burdensome. Dreyer's has refused to provide market studies and analysis based product sales in the United States. In March 21, 2008 correspondence, Sterling narrowed the request to "marketing reports and analysis regarding Edy's brand products, but declined…geographic limitations…[and] to the final reports and analysis…not…underlying data, correspondences or email." *See* Exhibit E.

On May 29, 2008, petitioner agreed to limit the production to Dreyer's Marketing Division and modified the request to read as follows:

Quantitative and qualitative market research reports or analysis regarding ice cream products (including Edy's), such as, but not limited to, syndicated research and other market analysis and data purchased from third parties, studies regarding brand loyalty, market simulation, ~~product concept, media plan, market segmentation,~~ price elasticity, consumer perceptions and behavior analyses of non-price promotional efforts (in-store display and advertising), temporary price reductions~~, and other market analyses~~ for Puerto Rico and the United States and for Hispanic customers in the United States.

*See* Exhibit D, at 3-5. At that time petitioner's counsel also limited the time period and provided further clarification regarding the type of market research and reports being sought. *See id.* at 4-5.

Petitioner submits that market studies and analysis about customer behavior regarding the purchase of Edy's ice cream are directly relevant to market definition and effects of defendants' alleged anti-competitive conduct. The documents sought are of substantial importance because there are many overlapping aspects between Puerto Rico and mainland ice cream retail markets: (1) retail grocery stores offer take home ice cream from retail freezer displays; (2) Edy's

Letter to Hon. Joseph C. Spero
June 6, 2008
Page 3

competes with other major U.S. brands (ice cream is no longer manufactured in Puerto Rico, but imported primarily from United States manufacturers); (3) temporary price reductions; and (4) in-store promotional programs are used to encourage sales. Edy's is Sterling's primary brand. Information regarding customer behavior and price elasticity studies will be particularly relevant for expert economic analysis in the underlying action.

Information about markets outside the relevant market is discoverable in antitrust actions. *See United States v. Dentsply Int'l, Inc.*, 2000-1 Trade Cas. (CCH) ¶ 72, 919 (D. Del. 2000); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 219 (D. Del. 1985) (stating that "regardless of how [the] geographic market is eventually defined in the action, the boundaries of that market do not set the geographic limit of discovery."). Under well recognized legal standards, the burden identified by Respondent does not outweigh petitioner's right to obtain relevant information that may lead to the discovery of admissible evidence. *See Gonzales v. Google*, 234 F.R.D. 674, 679 (N.D. Cal. 2006) Dreyer's is not a party in the litigation in Puerto Rico, but is wholly owned by defendant Nestlé S.A. The Amended Complaint implicates Dreyer's in the anti-competitive conduct. Thus, Dreyer's is not an unrelated third party respondent to a Rule 45 Subpoena. Consequently, petitioner respectfully submits that respondent should produce responsive documents and designate a person to testify regarding same.

**Third Party Dreyer's' Position**

Dreyer's, a non-party to the underlying litigation by every legal definition, has complied with or reached a compromise on a massive quantity of requested discovery over the past ten months. The only issue that remains is a *portion* of a *single* remaining document specification originally contained in a Rule 45 subpoena issued nearly a year ago. Contrary to the tenor of Sterling's remarks, Dreyer's has been more than cooperative and forthcoming in the discovery process. Dreyer's compliance with Sterling's discovery requests over the past ten months has required a monumental effort involving two in-house counsel, three outside counsel, two paralegals, and numerous Dreyer's employees. All of that discovery was provided at no cost to Sterling. During this period, Dreyer's has reviewed thousands of documents, produced 3,000 pages of documents, proffered a Rule 30(b)(6) corporate designee, and provided three other deposition witnesses at a cost of nearly $200,000 (over $110,000 for document review and production and over $75,000 for deposition preparation and defense).

The remaining portion of that lone document request -- seeking "all marketing reports or analysis" and several other broad and ill-defined categories of documents on a nationwide scale -- is a textbook example of the sort of overbroad, unduly burdensome, and attenuated request that led to the discovery reforms of 1991 and 1993. Significantly, even with respect to this one remaining request, Dreyer's has already produced all responsive documents that relate to Puerto Rico, the alleged relevant geographic market and the situs of the underlying litigation. Nothing more should be required given the operative pleadings, the applicable law as discussed below, and the undisputed burden of compliance.

In its Amended Complaint, **Sterling alleges that "the relevant geographic market for the claims asserted by Sterling is the Commonwealth of Puerto Rico," or possibly "narrower regions of Puerto Rico, be it municipalities or specific geographic segments."**

Letter to Hon. Joseph C. Spero
June 6, 2008
Page 4

(Amended Complaint ¶14)(emphasis supplied). Sterling further maintains that the Puerto Rico ice cream distribution market is drastically different than the U.S. market(s):

> In the ice cream business, warehouse systems, in addition to warehousing at minus 20 degrees Fahrenheit, must also have specialized ice cream freezers in the back room of each grocery store. In Puerto Rico, no retail stores possess this kind of system. The average temperature in warehouse freezers in Puerto Rico is zero degrees Fahrenheit, too warm for ice cream. In Puerto Rico, therefore, the only way to enter the market is by setting up a dedicated ice cream direct store distribution ("DSD") system. A DSD system is a full service system wherein the supplier typically takes the product from the manufacturer to the shelf directly, merchandises it, and takes away credits (bad, damaged or expired products).

(Amended Complaint ¶15f.) A party's pleadings define the proper scope of discovery under the Federal Rules.

Without question, Sterling's request for nationwide discovery extends far beyond the relevant geographic market set forth in the pleadings and is drastically out of proportion. **Ice cream sales in Puerto Rico account for less than one tenth of one percent of Dreyer's total ice cream sales**, yet plaintiff seeks documents covering the entire United States. When pressed, Sterling's counsel could not explain how consumer brand loyalty or lack thereof in, for example, Detroit or Duluth, would be at all useful in a case limited to distribution practices in Puerto Rico. Sterling's hope that something useful might turn up in discovery is not a sufficient justification to warrant such a sweeping and intrusive request, particularly when directed at a third party. *See, e.g., Beinin v. Center for the Study of Popular Culture*, 2007 WL 832962, at *2, *5 (N.D. Cal. Mar. 16, 2007)("even if [the discovery sought] exists, the Center has made no showing that such disconnected [discovery] would have other than the most tenuous relationship to the issues presented in this action"); *Mr. Frank, Inc. v. Waste Management, Inc.*, 1981 U.S. Dist. LEXIS 11777, at *7 (N.D. Ill. Mar. 27, 1981)(" evidence relating to defendants' operations throughout the Central United States may be probative . . . . However, the slim possibility that this broad discovery may prove fruitful must be balanced against the undeniable expense and inconvenience . . . in producing the documents and information requested").

Pertinent legal authority recognizes that the sole request at issue is objectionable. The geographic scope of discovery in an antitrust case is appropriately limited to alleged geographic markets affected by the alleged anticompetitive acts. *See, e.g., Heartland Surgical Specialty Hosp. v. Midwest Div., Inc.*, 2007 WL 2668742, at *10-*11 (D. Kan. 2007 Sept. 6, 2007)(precluding discovery in antitrust case seeking information for all of Missouri where relevant geographic market was defined as Kansas City area); *Mr. Frank, Inc.*, 1981 U.S. Dist. LEXIS 11777, at *4-*7 (interrogatories to party seeking information outside geographic scope of antitrust allegations held unduly burdensome); *In re Fertilizer Antitrust Lit.*, 1979 WL 1690, at *10-*11 (E.D. Wash. Sept. 14, 1979)(denying motion to compel and restricting geographic scope of discovery to area of antitrust allegations)(citing additional authority); *William Goldman Theaters, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 54 F.R.D. 201, 201-02 (E.D. Pa. 1971)(denying motion to compel discovery in U.S. on ground plaintiff alleged purely local antitrust claim confined to Philadelphia)(citing additional authority); *Barker v. Jewel Food Stores, Inc. v.*, 2001 WL 35906469, at *2-*4 (Ill. Cir. Nov. 2, 2001)(denying motion to compel in antitrust case where plaintiff sought discovery outside of geographic area alleged / area where parties

Letter to Hon. Joseph C. Spero
June 6, 2008
Page 5

competed)(surveying numerous cases).  Given this extensive authority, Dreyer's is on solid ground regarding its relevancy objection.  Moreover, the cases relied upon by Sterling are inapposite.[3]

Plaintiff's supposed effort to "narrow" its sweeping request through minor editing does not ameliorate the fundamental problems of overbreath, burdensomeness, and lack of relevancy. The heavy burden to comply is palpable and not in dispute.  Compliance would require Dreyer's to search through both the paper *and* electronic files of approximately seventy five employees. Each of these seventy five employees maintains electronic records in at least the form of:  (i) an email account on the Dreyer's server; (ii) personal or .pst files; (iii) data saved on the employees' individual hard drive; and (iv) data saved on a shared computer drive.  Within the shared drive, there are approximately fifty different shared folders.  There is no standard for labeling documents of the sort requested at Dreyer's.  As a result, searching for the information sought in Request No. 5 on a nationwide basis would require Dreyer's to open virtually every electronic file to determine "responsiveness" (including verifying the date of each document and the substantive content).  Thus, Sterling's purported effort to "narrow" the request has not mitigated the extreme burden Sterling seeks to impose on Dreyer's.

Though plaintiff asserts that the foregoing burden is not great, plaintiff is unwilling to bear the cost of that burden.  This is the best evidence that the burden is indeed too extreme to justify compliance with the request.  Compounding the problem is the fact that there is little downside for plaintiff to push the limits of discovery beyond proper bounds.  Given the foregoing, Dreyer's respectfully submits that the burden of discovery compliance on a non-party has already far exceeded legal bounds, and the request to compel yet further discovery of national scope should be denied.

Very truly yours,
*/s/ David J. Gilles*
David J. Gilles
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53701-2719
Telephone:    (608) 284-2219
dgilles@gklaw.com

On behalf of Sterling Merchandising, Inc.

---

[3]  Sterling cites *Google*, 234 F.R.D. 674, a non-antitrust case with no alleged geographic market at issue and thus, is seemingly impertinent.  Even so, *Google* held that where, as here, the information sought is "trade secret or confidential commercial information from a non-party," Sterling must further demonstrate "that the requested discovery is **relevant** and **essential** to a judicial determination of the case." *Id.* at 884, 885 (emphasis supplied). Aside from conclusory allegations, Sterling has not satisfied *Google's* mandate.

The *Kellam* and *Dentsply* cases Sterling cites stand only for the proposition that discovery outside the alleged relevant geographic market may be obtained when the information sought relates to *liability* issues, i.e., "to establish design or pattern to monopolize or intent to conspire in violation of the antitrust laws." *Kellam*, 616 F. Supp. at 217-18, 219; *Dentsply*, 2000-1 Trade Cas. (CCH) ¶ 72, 919.  In contrast, Sterling supposedly seeks the information at issue for market definition purposes, thus rendering the *Kellam* and *Dentsply* reasoning inapplicable.

Letter to Hon. Joseph C. Spero
June 6, 2008
Page 6

*/s/ Carmine R. Zarlenga (with permission)*
Carmine R. Zarlenga
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 2004
Telephone:     (202) 383-6676
zarlengac@howrey.com

On behalf of Dreyer's Grand Ice Cream, Inc.

Enclosures

cc:     All Counsel (via electronic mail)

## PROOF OF SERVICE

**Re:    STERLING MERCHANDISING, INC., v. DREYER'S GRAND
ICE CREAM, INC.
Case No. 08-80108 SBA (JCS)**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Zelle, Hofmann, Voelbel, Mason & Gette LLP, 44 Montgomery Street, Suite 3400, San Francisco, CA  94104.

On June 6, 2008, I served the within document(s) described as:

1.    JOINT LETTER BRIEF TO HONORABLE JOSEPH C. SPERO

on the interested parties to this action as follows:

Carmine Zarlenga                    zarlengac@howrey.com

Erik Koons                          koonse@howrey.com

Seth Erbe                           seth.erbe@indianowilliams.com

Luis Oliver                         loliver@fgrlaw.com

☒    (BY ELECTRONIC MAIL)  I caused such document(s) to be emailed to the offices and/or to attorneys of offices of the above named addressee(s).

Executed on June 6, 2008, at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_/s/Monica J. Steele_
Monica J. Steele

3173594v5

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

STERLING MERCHANDISING, INC.,

        Plaintiff,

    v.

NESTLÉ, S.A.; NESTLÉ PUERTO RICO, INC.;
and PAYCO FOODS CORPORATION,

        Defendants.

Civil No. 06-1015  (SEC)

JURY TRIAL DEMANDED

**AMENDED COMPLAINT**

**TO THE HONORABLE COURT:**

    **APPEARS NOW** Plaintiff Sterling Merchandising, Inc. ("Sterling"), by and through the undersigned counsel, brings this action against defendants Nestlé, S.A. and Nestlé Puerto Rico, Inc. (collectively, "Nestlé") and Payco Foods Corporation ("Payco"), for damages and injunctive relief under the antitrust laws of the United States and the Commonwealth of Puerto Rico, and hereby demands a trial by jury. In support thereof, Sterling alleges as follows:

**NATURE OF THE ACTION**

1.    This action arises out of Nestlé and Payco's anticompetitive, collusive and monopolistic practices in the conduct of trade or commerce, specifically those acts or practices that they intended to use, did use, and continue to use to prevent and destroy competition and acquire and/or maintain monopoly power in the market for ice cream distribution in Puerto Rico.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 2

2.     Through the use of exclusionary contracts, a series of anticompetitive

       acquisitions, and related exclusionary conduct, Nestlé and Payco have unlawfully

       acquired a dominant market share of the relevant market and suppressed

       competition in the relevant market, thereby injuring consumers and Sterling.

3.     Sterling seeks to recover for the injury to its business or property resulting from

       the defendants' anticompetitive and monopolistic practices.  Sterling also seeks

       treble damages, injunctive and declaratory relief, and costs, including reasonable

       attorneys' fees.

## JURISDICTION AND VENUE

4.     Pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, this

       action is for damages and injunctive relief for violations of Sections 1, 2 and 3 of

       the Sherman Act, 15 U.S.C. §§ 1, 2, 3 and Section 3 of the Clayton Act, 15 U.S.C.

       § 14.  This Court has jurisdiction over this civil action pursuant to 15 U.S.C. §§

       26 and 28 and 28 U.S.C. §§ 1331, 1337(a).

5.     Supplementary jurisdiction is invoked for certain state-based claims, in particular

       the Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann. §§ 257-276, since the

       factual background for their application is virtually identical to the facts of the

       federal claims giving original jurisdiction to this Court.

6.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, 26 and 28 U.S.C.

       §§ 1391 because (a) at least one of the defendants is doing business within this

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 3

district, and (b) it was this judicial district in which a substantial part of the events

or omissions alleged herein occurred.

## TRADE AND COMMERCE AFFECTED

7.    At all relevant times hereto, at least some of the defendants were engaged in the

distribution and sale of ice cream products in Puerto Rico.

8.    The defendants' business activities that are the subject of this complaint were

within the flow of and substantially affected trade and commerce in Puerto Rico,

between Puerto Rico and various states, and among the several states.

## THE PARTIES

9.    Sterling is a corporation organized and existing under the laws of the

Commonwealth of Puerto Rico, and having its principal place of business at "C"

Street, Lot 29, Luchetti Industrial Park, Bayamón, Puerto Rico 00961.

10.   Upon information and belief, defendant Nestlé, S.A. is a corporation organized,

existing and doing business under and by virtue of the laws of Switzerland, with

its principal executive offices located at Avenue Nestlé 55, CH-1800, Vevey,

Switzerland.  Nestlé, S.A owns 100% of the shares of Nestlé Puerto Rico, Inc. and

Payco.  Nestlé, S.A. is the largest food company in the world.  With its recent

acquisition of Dreyer's Grand Ice Cream Holdings, Inc. and Dreyer's Grand Ice

Cream, Inc. (hereinafter, "Dreyer's"), through its subsidiaries, Nestlé, S.A. has

also become one of the two dominant ice cream companies in the world.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 4

11.    Upon information and belief, defendant Nestlé Puerto Rico, Inc. is a corporation wholly owned, controlled and organized by Nestlé, S.A. under the laws of the Commonwealth of Puerto Rico. Nestlé Puerto Rico, Inc. has its principal place of business at Carretera Estatal Num. 869, Km. 3.4, Centro de Distribucion del Norte, Barrio Palmas, Cataño, Puerto Rico 00962. Nestlé Puerto Rico, Inc. is merely a business conduit of Nestlé S.A.'s business goals, including the monopolization of the ice cream market in Puerto Rico. Nestlé S. A. makes all the decisions on behalf of Nestlé Puerto Rico, Inc. and is in reality its alter ego.

12.    Upon information and belief, defendant Payco is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Street Number 3, Lots 10 and 11, Hato Tejas Industrial Park, Bayamón, Puerto Rico 00956.

## NESTLÉ'S MONOPOLY POWER IN THE RELEVANT MARKET

### The Relevant Product Market

13.    The relevant product market is the market for the distribution of ice cream products, and possibly narrower submarkets therein.

### The Relevant Geographic Market

14.    At all material times, the relevant geographic market for the claims asserted by Sterling is the Commonwealth of Puerto Rico. Relevant geographic retail markets for the sale of ice cream products exist in narrow regions of Puerto Rico, be it municipalities or specific geographic segments, but the defendants' degree of

dominance would not vary much in these submarkets from its overall dominance

in Puerto Rico generally.

### Entry Barriers

15.    There are significant barriers to entry into the relevant market in this case:

   a.    In the ice cream business, warehouse systems, in addition to warehousing
          at minus 20 degrees Fahrenheit, must also have specialized ice cream
          freezers in the back room of each grocery store. In Puerto Rico, no retail
          stores possess this kind of system. The average temperature in warehouse
          freezers in Puerto Rico is zero degrees Fahrenheit, too warm for ice cream.
          In Puerto Rico, therefore, the only way to enter the relevant market is by
          setting up a dedicated ice cream direct store distribution ("DSD") system.
          A DSD system is a full service system wherein the supplier typically takes
          the product from the manufacturer to the shelf directly, merchandises it,
          and takes away credits (bad, damaged or expired products). In markets
          characterized by DSD systems, like this one, new distributors incur the
          substantial risk of introducing new products instead of the retailers.

   b.    The sunk capital necessary to compete in this market is considerably
          higher than most distribution markets. Sunk capital is defined as
          expenditures that cannot be recovered in whole or in part if the entrant
          exits the market. Any new competitor in the relevant market would need
          expertise, extremely low temperature specialized trucks for storing
          products at minus 20 degrees Fahrenheit, and substantial capital for
          display equipment and ancillary equipment.

   c.    Building routes dense enough to support the high fixed cost of the
          equipment needed is an especially high barrier to entry given the
          numerous exclusive and exclusionary contracts Nestlé and Payco have put
          in place with retailers throughout Puerto Rico. In order to be able to
          compete, the routes need a dense enough customer base so that a
          competitive amount of stops can be attained. This is time-consuming and
          very expensive in that it creates substantial sunk costs for new entrants
          into DSD system markets. It would take a new entrant a significantly
          greater time and expense than incumbent firms to enter markets with these
          characteristics.

   d.    There are a limited number of ice cream brands for companies like
          Sterling to distribute because two international corporations, Unilever and

Nestlé, dominate the ice cream market. Only a handful of regional brands have been able to keep pace with these companies' brands, mostly because Unilever and Nestlé are able to spread the costs of launching a new product across a very broad distribution base.

e.     All attempts at entry into the relevant product market since at least 1993 have failed, or are currently in the process of failing.

f.     The defendants' large market share, coupled with their exclusive and exclusionary contracts with retailers, make it virtually impossible for a new entity to enter the relevant market successfully. One relatively new entrant to the relevant market, Palm Industries, despite having expertise and substantial capital and financing, is struggling. Today, Palm has accumulated a multi-million dollar deficit and has not shipped its merchandise (Blue Bunny) to Puerto Rico for almost 12 months out of the last two years.

### Defendants' Monopoly Power in the Relevant Market

16.    Currently, Sterling is the defendants' only viable competitor in the relevant market, and the defendants' market share in the relevant market is overwhelming – approximately seventy (70) percent. This market share percentage does not include the indirect control Nestlé has over Sterling's primary brand, Edy's Grand. Nestlé has acquired the owner of the Edy's brand, Dreyer's, and thus has control over the prices under which Sterling may purchase Edy's ice cream and sell it to others, and has the power to withhold Edy's ice cream to Sterling all together.

17.    At all material times, the defendants have had and continue to have substantial market power in the relevant market for the distribution of ice cream products.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 7

## DEFENDANTS' UNLAWFUL, ANTI-COMPETITIVE ACTIVITIES

18.    During the early 1990's, the ice cream market in Puerto Rico had many
manufacturers and distributors. Today, that market is controlled by Nestlé and
Payco by virtue of their aggressive acquisition strategy and agreements over the
past dozen years, vertical exclusive dealing agreements with retailers in Puerto
Rico, and related anticompetitive agreements and practices, all of which have
continued to the present.

### Defendants' Unlawful Acquisition Strategy

19.    In the early 1990's, the main manufacturers and distributors were Mantecados
Jocel (now out of business); Mantecados Payco, Inc., owned by Beatrice Foods
(defendant Payco's predecessor); Flav-O-Rich, Inc., owned by Mid-American
Dairymen, Inc. (acquired by Payco in 1996); Mantecados Nevada, Inc. (acquired
by Nestlé in 1998); Delicatessen Specialties (acquired by Thomas Ward in the
1990's, and later by Nestlé); Suiza Dairy, Inc., ice cream distribution business
(acquired by Payco in 1998); and Caribbean Frutti, Inc. (selected assets of which
were acquired by Sterling in 2001 and the remainder is defunct).

20.    Sterling entered the ice cream distribution business in 1993. Its principal products
were Edy's, Ben & Jerry's and Barber's. Sterling is the only successful entrant
into the ice cream distribution business in Puerto Rico in at least the past twelve
years. Sterling currently distributes Edy's, Turkey Hill, Good Humor, Ben &

Jerry's, Klondike, Popsicle, Budget Saver Twin Pops and Rich's ice cream in various areas of Puerto Rico.

21.    On several occasions, Nestlé has approached Sterling in an effort to buy it. Sterling's owners have declined to sell the company.

22.    In 1998, Nestlé acquired control of the second largest DSD system in Puerto Rico through its acquisition of Mantecados Nevada.

23.    By 2001, after Nestlé's purchase of Mantecados Nevada, the only competing entities in the relevant product market were Payco, Nestlé and Sterling.

24.    Upon information and belief, in early 2002, over a year-and-a-half before its acquisition of Dreyer's, Nestlé began making advances to buy one of its two remaining competitors in the relevant market, Payco.

25.    Upon information and belief, in 2002, while Payco and Nestlé were in discussions to combine assets in some manner, Payco and Nestlé were jointly buying space and entering into exclusive and exclusionary contracts with retailers.

26.    In June 2003, Nestlé, S.A., through its subsidiaries, purchased 67% ownership of Dreyer's, owners of the Edy's Grand Ice Cream brand (distributed in Puerto Rico by Sterling), thus acquiring the largest DSD system in the United States.

27.    The net effect of Nestlé's acquisition of Dreyer's and its popular premium ice cream brand, Edy's, was to make Nestlé the principal supplier of one of its two remaining competitors, Sterling.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 9

28.    Almost at the same time as the acquisition of Dreyer's in June 2003, Nestlé S.A.,
       through Nestlé Puerto Rico Inc., entered into an agreement to buy Payco.  In
       conjunction therewith, Nestlé and Payco signed a Stock Purchase Agreement
       ("SPA") pursuant to which Payco sold to Nestlé 100% of its stock in two steps.
       Half of the shares (50%) were sold on or about June 30, 2003, for the sum of
       Twenty Million U. S. Dollars ($20,000,000.00).  An irrevocable option to buy the
       remaining half of the shares was granted by Payco; the option price was to be
       defined on the basis of several values with an arbitration clause in case the parties
       did not agree on a price.

29.    By virtue of Nestlé's acquisition of all shares of Payco, it controls Payco.  The
       acquisition by Nestlé of Dreyer's and Payco gave Nestlé effective control of over
       eighty (80) percent of the relevant product market in Puerto Rico.  (Because
       Nestlé now controls Payco entirely, "Nestlé" will hereinafter refer to Nestlé and
       Payco collectively.)

30.    Nestlé's acquisition of Payco was analyzed by the Puerto Rico Office of
       Monopolistic Affairs (hereinafter, "OMA").  OMA determined that Nestlé's
       acquisition would lead to an anticompetitive market in the relevant product
       market of ice cream.  In an attempt to save the only ice cream factory in Puerto
       Rico and keep Nestlé active in Puerto Rico, however, OMA issued its consent to
       the acquisition of Payco by Nestlé under several conditions, among which was the

requirement that, if Nestlé bought Dreyer's (which it did), it could not strip the

Edy's brand distribution rights from Sterling unless certain conditions were met.

31.    In 2004, Payco filed suit against Nestlé S.A. and its subsidiaries, Nestlé P.R. and

Nestlé Holding, Inc., for their supposed violations in connection with the SPA.

*See* U.S. District Court, District of Puerto Rico, Civil Case 05-1628 (JAF).  In the

suit, Payco alleged, among other things, that Nestlé fraudulently induced Payco to

assume operation of the manufacturing facility, which was in precarious physical

condition, deficient and inoperative, which led to serious economic loss, reducing

Payco's value.

32.    In the course of this litigation, the President of Payco, Thomas Ward, alleged that

Nestlé, through its misrepresentations with regard to the factory, fraudulently

induced OMA to consent to the merger transaction.  This lawsuit was settled and

dismissed in or around September 2005.

33.    After signing the Consent Order with the OMA, Nestlé closed the manufacturing

plant in Bayamón and initiated conversations to purchase Sterling without

obtaining OMA's prior consent.

### Defendants' Exclusionary Conduct

34.    After OMA's Consent Order had been signed, Nestlé again attempted, this time

through coercion, to induce Sterling to sell its business, which would have

effectively given Nestlé a complete monopoly over the relevant product market.

First, on or about July 2003, Nestlé warned that after its acquisition of Payco,

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 11

        things would get more difficult for Sterling, and Sterling should sell the business

to Nestlé's partner, Payco. Sterling again declined to sell. Second, on or about

December 2003, given Sterling's refusal to sell, Nestlé, through its newly

purchased entity, Dreyer's, notified Sterling that Dreyer's prices to Sterling

"could rise" due to Nestlé's control of Dreyer's.

35.    Upon information and belief, after Nestlé acquired Dreyer's, and therefore the

Edy's brand, in 2003, Nestlé increased the price of Edy's to Sterling without a

similar rise of prices to distributors in the rest of the United States. Because

Nestlé controls and maintains the wholesale prices of other brands with which

Sterling must compete, Nestlé's conduct amounts to a price-cost squeeze that

adversely impacts competition. This adversely affected Sterling's ability to

compete in the relevant market, unlawfully enhanced the defendants' monopoly

power, and injured consumers through both increased retail prices and constricted

retail options.

36.    Upon information and belief, Nestlé has also engaged in exclusive and

exclusionary dealings with a substantial percentage of retail stores in the relevant

market in order to willfully maintain its monopoly and attempt to destroy Sterling.

The following chart illustrates the approximate percentage of shelf space Nestlé

possesses in the relevant market as of January 2006:

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 12

| | | |
|---|---|---|
| Econo | 100% Nestlé | 6.0 million |
| Mr. Special | 100% Nestlé | 1.2 million |
| Selectos | 100% Nestlé | 1.0 million |
| Supermax | 100% Nestlé | 0.7 million |
| Coop | 100% Nestlé | 0.5 million |
| Ponce Cash and Carry | 100% Nestlé | 0.5 million |
| CentroMax | 100% Nestlé | 1.0 million |
| El Amal | 100% Nestlé | 0.7 million |
| Walgreens | 100% Nestlé | 2.0 million |
| Ralph's (& Del Este) | 90% Nestlé 10% Sterling | 1.5 million |
| Pitusa | 80% Nestlé 20% Sterling | 1.5 million |
| Grande | 75% Nestlé 25% Sterling | 4.0 million |
| Pueblo | 40% Nestlé 10% Sterling 50% Pueblo | 5.0 million |
| Amigo/Wal-Mart | 30% Nestlé 50% Sterling 20% Amigo | 6.0 million |

37.    This landscape has slightly changed as of June 15 2007:

| | | |
|---|---|---|
| Econo | 100% Nestlé | 6.0 million |
| Mr. Special | 100% Nestlé | 1.2 million |
| Selectos | 100% Nestlé | 1.0 million |
| Supermax | 50% Nestlé 50% Sterling | 0.7 million |
| Coop | 100% Nestlé | 0.5 million |
| Ponce Cash and Carry | 100% Nestlé | 0.5 million |
| CentroMax | 100% Nestlé | 1.0 million |
| El Amal | 100% Nestlé | 0.7 million |
| Walgreens | 95% Nestlé 5% Sterling | 2.0 million |

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 13

| | | |
|---|---|---|
| Ralph's (& Del Este) | 90% Nestlé<br>10% Sterling | 1.5 million |
| Pitusa | 50% Nestlé<br>25% Sterling<br>25% Well's Dairy | 1.5 million |
| Grande | 40% Nestlé<br>30% Sterling<br>30% Well's Dairy | 4.0 million |
| Pueblo | 40% Nestlé<br>10% Sterling<br>50% Pueblo | 5.0 million |
| Amigo/Wal-Mart | 30% Nestlé<br>50% Sterling<br>20% Amigo | 6.0 million |

38.    Upon information and belief, Nestlé began entering into exclusive and

exclusionary agreements with retailers throughout Puerto Rico beginning in 1999

and continuing to the present. These agreements had the purpose and effect of

limiting competition and adversely impacting consumer welfare generally in

Puerto Rico.

39.    Upon information and belief, retailers have been induced in some cases to enter

into exclusive and exclusionary arrangements with Nestlé because of substantial

payments from Nestlé to the retailers that are in many cases unremunerative and,

hence, predatory.

40.    If Sterling is forced to exit the relevant market completely, Nestlé will be able to

recoup its unremunerative payments because of the substantial barriers to entry in

the relevant market.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 14

41.     In some regions of Puerto Rico, Nestlé holds 100 percent market share as a result
        of these exclusionary contracts (*i.e.*, Lares, Vieques, Culebra, Patillas, *etc.*).

42.     In those retail stores and local geographic areas where Nestlé controls all or
        virtually all ice cream distribution and does not face competition due to its actions
        foreclosing competition from its last remaining competitor, Sterling, consumers
        are denied the option of purchasing ice cream products of equal or greater quality
        to Nestlé's offerings at substantially lower prices.

43.     Upon information and belief, prior to its acquisition of Payco, Payco and Nestlé
        conspired with each other to coordinate their offers of payments for shelf space to
        retailers.

### THE ANTI-COMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

44.     Nestlé's anticompetitive actions have caused injury to consumers and Sterling.
        Nestlé's tactics foreclosed the competitive process by preventing rivals, such as
        Sterling, from competing on price, quality of service and variety of products
        offered in the relevant market and has prevented new entrants from entering the
        relevant market.  As a result, many consumers do not have the choice to purchase
        Sterling's brands in many cases or enjoy the competitive benefits Sterling's
        brands would provide in terms of price, quality and terms of service.  In other
        areas where Sterling has been able to distribute in competition with Nestlé,
        Sterling's ability to compete has been adversely affected and its distribution costs
        have been increased by Nestlé's tactics.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 15

45.    Sterling's Edy's Grand and Turkey Hill brands offer a greater variety of choices than any of Nestlé's brands.  For example, Edy's offers up to 31 flavors of premium ice cream, over 20 flavors of light ice cream, 6 flavors of sherbet, 8 flavors of no-sugar ice cream, 4 flavors of fat-free, no-sugar ice cream, 6 flavors of frozen yogurt, and 4 flavors of low-carb ice cream, for a total of 79 items to choose from in every sub-category the ice cream market offers.  In contrast, the complete Lady Richmond line only has approximately 16 items.  The total Nestlé Gold line offers approximately 12 items.  Flav-O-Rich offers approximately 5 similar items.  The Breyers line typically offers less variety than the Edy's line, while the Edy's line typically sells for, on average, over a dollar ($1.00) less than Breyers.

46.    As a direct result of Nestlé's actions, consumers in many parts of the relevant geographic market are unable to purchase a brand that they clearly prefer.

47.    In those geographic markets where Sterling's product is permitted by Nestlé to reach consumers, Nestlé's price-cost squeeze directed at Sterling and other exclusionary activities have adversely impacted consumer welfare and Sterling.

48.    Nestlé's overwhelming market share, which it has obtained from a series of anticompetitive acquisitions and exclusionary actions and agreements, allows Nestlé to possess monopoly power to set prices and exclude a variety of competitors and new entrants to the relevant market.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 16

49.    Nestlé's unlawful acquisition and maintenance of a monopoly over the ice cream

distribution market in Puerto Rico has caused substantial and irreparable injury to

Sterling among others, by way of lost sales and profits, lost good will, loss of

investment capital, decreased business value, damage to reputation, lost business

opportunities, and loss of future sales.

## First Cause of Action

### Unlawful Restraint of Trade in Violation of Sections 1 and 3
### of the Sherman Antitrust Act
### 15 U.S.C. §§ 1, 3

50.    Sterling incorporates herein by reference as if fully set forth each of the

allegations contained in paragraphs 1 through 49, above.

51.    Nestlé has participated in conspiracies to unreasonably restrain trade by engaging

in: (1) per se illegal horizontal agreements with defendant Payco and other ice

cream distributors prior to Nestlé's acquisition of Payco; (2) unlawful

combinations with Payco and other ice cream distributors and suppliers; and

(3) exclusive, anticompetitive vertical agreements with ice cream retailers.

52.    Through the anticompetitive conduct described herein, Nestlé has unreasonably

restrained trade in the relevant market in violation of Sections 1 and 3 of the

Sherman Act, 15 U.S.C. §§ 1, 3.

53.    As a result of these violations of the Sherman Act, Sterling has been effectively

prevented from competing in much of the relevant geographic market at all and,

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 17

even where it has been permitted to compete, from competing fully in much of the relevant market.

54.    Sterling's exclusion from competition in the relevant market has substantially adversely affected consumers of these products and competition in general. The defendants' conduct has harmed the competitive process as well as Sterling. Sterling has suffered antitrust injury by reason of the defendants' antitrust violations.

55.    As a direct and proximate result of the above-described conduct, Sterling and consumers have suffered and will suffer damages for which the defendants are liable.

## Second Cause of Action

### Monopolization in Violation of Section 2 of the Sherman Act
### 15 U.S.C. § 2

56.    Sterling incorporates herein by reference as if fully set forth each of the allegations contained in paragraphs 1 through 55, above.

57.    Nestlé possesses monopoly power in the market for the distribution of ice cream products in Puerto Rico, which is a relevant antitrust market.

58.    Through the anticompetitive conduct described herein, Nestlé has willfully acquired and maintained its monopoly power in the relevant market. Nestlé has acted with an intent to illegally acquire and maintain its monopoly, and its anticompetitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 18

59.  Through the anticompetitive conduct described herein, Nestlé has, along with
     other entities, including defendant Payco, willfully conspired to acquire and
     maintain its monopoly power in this market. Nestlé has acted with a general
     intent to illegally conspire to acquire and/or maintain its monopoly, and its
     anticompetitive conduct has enabled it to do so, in violation of Section 2 of the
     Sherman Antitrust Act, 15 U.S.C. § 2.

60.  Nestlé's direct and indirect manipulation, control and maintenance of (1)
     wholesale prices and (2) the prices charged to retailers unlawfully enhance and
     maintain defendants' monopoly power, adversely affects Sterling's ability to
     compete, and injures consumers through both increased retail prices and
     constricted retail options.

61.  Nestlé's anticompetitive conduct described herein occurred in and affected
     interstate commerce.

62.  As a result of Nestlé's violations of Section 2 of the Sherman Antitrust Act,
     Sterling has been effectively excluded from much of the relevant market.

63.  Sterling's exclusion from competition in the relevant market has adversely
     affected consumers of these products and competition in general. The defendants'
     conduct has harmed the competitive process as well as Sterling. Sterling has
     suffered antitrust injury by reason of the defendants' antitrust violations.

64.  As a direct and proximate result of the above-described conduct, Sterling has
     suffered and will suffer damages for which the defendants are liable.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 19

### Third Cause of Action

**Attempted Monopolization in Violation of Section 2
of the Sherman Antitrust Act
15 U.S.C. § 2**

65.     Sterling incorporates herein by reference as if fully set forth each of the

allegations contained in paragraphs 1 through 64, above.

66.     Nestlé possesses substantial market power in the market for the distribution of ice

cream products in Puerto Rico.

67.     Through the anticompetitive conduct described herein, Nestlé has willfully

attempted to acquire and maintain its monopoly power in the relevant market.

Nestlé has acted with a specific intent to attempt to illegally acquire and maintain

its monopoly, and its anticompetitive conduct has enabled it to do so, in violation

in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

68.     There is a dangerous probability that Nestlé will succeed in its attempt to achieve

monopoly power in the relevant market because of its exclusionary conduct.

69.     Nestlé's anticompetitive conduct described herein occurred in and affected

interstate commerce.

70.     As a result of Nestlé's violations of Section 2 of the Sherman Antitrust Act,

Sterling has been effectively excluded from the relevant market.

71.     Sterling's exclusion from competition in the relevant market has adversely

affected consumers of these products and competition in general.  The defendants'

conduct has harmed the competitive process as well as Sterling.  Sterling has

suffered antitrust injury by reason of the defendants' antitrust violations.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 20

72.    As a direct and proximate result of the above-described conduct, Sterling has
suffered and will suffer damages for which the defendants are liable.

### Fourth Cause of Action

### Exclusive Dealing in Violation of Section 3 of the Clayton Act
### 15 U.S.C. § 14

73.    Sterling incorporates herein by reference as if fully set forth each of the
allegations contained in paragraphs 1 through 72, above.

74.    Nestlé, in the course of commerce, made sales or contracts for sales of goods
wares, merchandise, supplies or other commodities for use, consumption, or
resale, or fixed a price charged therefor, or discount from, or rebate upon such
price, in Puerto Rico on the condition, agreement, or understanding that the
purchasers thereof shall not use or deal in the goods, wares, merchandise, supplies
or other commodities of Nestlé's competitors.

75.    The anticompetitive conduct described herein has had the effect of substantially
lessening competition and has tended to create a monopoly in this line of
commerce, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

76.    As a result of the defendants' violations of Section 3 of the Clayton Act, Sterling
has been effectively excluded from much of the relevant market.

77.    Sterling's exclusion from competition in the relevant market has adversely
affected consumers of these products and competition in general. The defendants'
conduct has harmed the competitive process as well as Sterling. Sterling has
suffered antitrust injury by reason of the defendants' antitrust violations.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 21

78.    As a direct and proximate result of the above-described conduct, Sterling has

suffered and will suffer damages for which the defendants are liable.

### Fifth Cause of Action

### Conspiracy to Monopolize in Violation of Sections 1 and 3
### of the Sherman Antitrust Act
### 15 U.S.C. §§ 1, 3

79.    Sterling incorporates herein by reference as if fully set forth each of the

allegations contained in paragraphs 1 through 78, above.

80.    Through the anticompetitive conduct described herein, Nestlé has conspired with

competitors, suppliers and buyers to acquire and maintain monopoly power in the

relevant market.

81.    Nestlé has illegally conspired to acquire and/or maintain its monopoly, and its

anticompetitive conduct has enabled it to do so, in violation of Sections 1 and 3 of

the Sherman Act, 15 U.S.C. §§ 1, 3.

82.    As a result of these violations of the Sherman Act, Sterling has been effectively

excluded from the relevant market.

83.    Sterling's exclusion from competition in the relevant market has adversely

affected consumers of these products and competition in general. The defendants'

conduct has harmed the competitive process as well as Sterling. Sterling has

suffered antitrust injury by reason of the defendants' antitrust violations.

84.    As a direct and proximate result of the above-described conduct, Sterling has

suffered and will suffer damages for which the defendants are liable.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 22

### Sixth Cause of Action

**Unlawful Restraints of Trade in Violation of the Puerto Rico Anti-Monopoly Act
10 P.R. Laws Ann. §§ 257 - 276**

85.  Sterling incorporates herein by reference as if fully set forth each of the
     allegations contained in paragraphs 1 through 84, above.

86.  Sterling incorporates each of the specific claims alleged above under the Sherman
     Act and the Clayton Act as if fully set forth also under the Puerto Rico Anti-
     Monopoly Act, 10 P.R. Laws Ann. §§ 257-276.

87.  The defendants' anticompetitive conduct and violations including, but not limited
     to, exclusive dealing, have created an unreasonable restraint of trade, and the
     defendants have conspired to create and have created (or have attempted to create)
     a monopoly and have substantially reduced competition in the relevant market in
     the Commonwealth of Puerto Rico.

88.  The defendants' conduct is designed and intended to eliminate Nestlé's
     competitors, in particular Sterling, in order to achieve, protect and enhance
     Nestlé's monopoly position and control of the relevant market.

89.  The defendants' conduct constitutes an unreasonable restraint of trade in violation
     of the Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann. §§ 257 - 276.

90.  Sterling's exclusion from competition in the relevant market has adversely
     affected consumers of these products and competition in general. The defendants'
     conduct has harmed the competitive process as well as Sterling. Sterling has
     suffered antitrust injury by reason of the defendant's antitrust violations.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 23

91.    As a direct and proximate result of the above-described conduct, Sterling has

suffered and will suffer damages, for which the defendants are liable.

### Seventh Cause of Action

### Monopolization in Violation of Section 260 of the Puerto Rico Anti-Monoplopy Act
### 10 P. R. Laws Ann. § 260

92.    Sterling incorporates herein by reference as if fully set forth each of the

allegations contained in paragraphs 1 through 91, above.

93.    Nestlé possesses monopoly power in the market for the distribution of ice cream

products in Puerto Rico.

94.    Through the anticompetitive conduct described herein, Nestlé has willfully

acquired and maintained its monopoly power in the relevant market. Nestlé has

acted with an intent to illegally acquire and maintain its monopoly, and its

anticompetitive conduct has enabled it to do so, in violation of Section 260 of the

Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann. § 260.

95.    Through the anticompetitive conduct described herein, Nestlé has, along with

other entities, including defendant Payco, willfully conspired to acquire and

maintain its monopoly power in this market. Nestlé has acted with a general

intent to illegally conspire to acquire and/or maintain its monopoly, and its

anticompetitive conduct has enabled it to do so, in violation of Section 260 of the

Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann. § 260.

96.    Nestlé's control and maintenance of the wholesale prices of other brands with

which Sterling must compete amounts to a price-squeeze that adversely impacts

competition.  This affected and reduced Sterling's market share and ability to

compete in the relevant market, unlawfully enhanced defendants' monopoly

power, and injured consumers through both increased retail prices and constricted

retail options.

97.    As a result of Nestlé's violations of Section 260 of the Puerto Rico

Anti-Monopoly Act, Sterling has been effectively excluded from much the

relevant market.

98.    Sterling's exclusion from competition in the relevant market has adversely

affected consumers of these products and competition in general.  The defendant's

conduct has harmed the competitive process as well as Sterling.  Sterling has

suffered antitrust injury by reason of the defendants' antitrust violations.

99.    As a direct and proximate result of the above-described conduct, Sterling has

suffered and will suffer damages for which the defendants are liable.

### Eighth Cause of Action

**Attempted Monopolization in Violation of Section 260 of the Puerto Rico
Anti-Monopoly Act
10 P.R. Laws Ann. § 260**

100.    Sterling incorporates herein by reference as if fully set forth each of the

allegations contained in paragraphs 1 through 99, above.

101.    Nestlé possesses substantial market power in the market for the distribution of ice

cream products in Puerto Rico.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 25

102.   Through the anticompetitive conduct described herein, Nestlé has willfully

attempted to acquire and maintain its monopoly power in the relevant market.

Nestlé has acted with a specific intent to attempt to illegally acquire and maintain

its monopoly, and its anticompetitive conduct has enabled it to do so, in violation

of Section 260 of the Puerto Rico Anti-Monopoly Act, 10 P.R. Laws Ann. § 260.

103.   There is a dangerous probability that Nestlé will succeed in its attempt to achieve

monopoly power in the relevant market because of its exclusionary conduct.

104.   As a result of Nestlé's violations of Section 260 of the Puerto Rico

Anti-Monopoly Act, Sterling has been effectively excluded from the relevant

market.

105.   Sterling's exclusion from competition in the relevant market has adversely

affected consumers of these products and competition in general.  The defendant's

conduct has harmed the competitive process as well as Sterling.  Sterling has

suffered antitrust injury by reason of the defendants' antitrust violations.

106.   As a direct and proximate result of the above-described conduct, Sterling has

suffered and will suffer damages for which the defendants are liable.

## TRIAL BY JURY

107.   Plaintiff Sterling hereby demands trial by jury on all issues and claims raised in

this Amended Complaint.

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 26

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Sterling respectfully requests:

A.    That this Honorable Court declare, adjudge, and degree that the defendants have committed the violations of federal and state antitrust law alleged herein;

B.    That this Honorable Court permanently enjoin the defendants and their agents and employees from continuing their unlawful conduct set forth herein and provide other appropriate injunctive relief;

C.    That Sterling recover its actual damages, in an amount to be determined at trial, and treble the damages it has sustained and will sustain as a result of the federal and state antitrust violations alleged herein;

D.    That Sterling recover its reasonable attorneys' fees and costs of suit;

E.    That Sterling recover pre-judgment interest and post-judgment interest on the above sums at the highest rate allowed by law; and

F.    That Sterling be granted such other and further relief as the Court may deem just and proper under the law.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on this 15th day of June, 2007.

**INDIANO & WILLIAMS, P.S.C.**
Attorneys for Plaintiff
207 del Parque Street; 3rd Floor
San Juan, Puerto Rico  00912
Tel: (787) 641-4545;  Fax: (787) 641-4544

STERLING V. NESTLÉ
AMENDED COMPLAINT
PAGE 27

david.indiano@indianowilliams.com
jeffrey.williams@indianowilliams.com

By: _____
          **DAVID C. INDIANO**
          **USDC PR Bar No. 200601**

By: _____
          **JEFFREY M. WILLIAMS**
          **USDC PR Bar No. 202104**

By:    s/ Seth A. Erbe_____
          **SETH A. ERBE**
          **USDC PR Bar No. 220807**

CO-COUNSEL
Kevin J. O'Connor
David J. Gilles
Jennifer Cotner
GODFREY & KAHN, S.C.
One East Main Street
Post Office Box 2719
Madison, Wisconsin 53701-2719
Telephone (608) 257-3911
Facsimile (608) 257-0609

mn317404_1

# EXHIBIT B

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STERLING MERCHANDISING, INC., | **SUBPOENA IN A CIVIL CASE** |
| V. | |
| NESTLE, S.A.; NESTLE PUERTO RICO, INC. and PAYCO FOODS CORPORATION | Case Number:[1]  06-CV-1015 USDC DPR |

TO:  Dreyer's Grand Ice Cream, Inc.
     Mark Lehocky, Registered Agent
     5959 College Avenue
     Oakland, CA 94618

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  See Exhibit B (attached)

| PLACE OF DEPOSITION  Zelle, Hoffman, Voelbel, Mason & Gette LLP  44 Montgomery Street, Suite 3400, San Francisco, CA 94104 | DATE AND TIME  9/25/2007 9:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Exhibit A (attached)

| PLACE | DATE AND TIME  9/11/2007 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE  August 29, 2007 |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |

David J. Gilles, Godfrey & Kahn, S.C., 1 East Main Street, PO Box 2719, Madison, WI 53701-2719 (608) 257-3911

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**EXHIBIT A**

Pursuant to Federal Rule of Civil Procedure 45(a)(2)(C), **YOU ARE COMMANDED** to produce and permit the inspection and copying of the following documents by the date and time specified in the subpoena to which this exhibit is attached. Please contact David J. Gilles at (608) 257-3911 to make arrangements for Sterling's inspection of the documents or if you have questions concerning this subpoena.

Failure to comply with this subpoena may result in punishment for contempt, which may include monetary penalties, imprisonment, and other sanctions.

### Definitions

1.      The term "document" or "documents" as used herein shall be defined to the broadest extent permitted by Federal Rules of Civil Procedure 26 and 34, and includes, whenever applicable and without limitation, the originals (absent any original, a copy) of any recordation of any intelligence or information, whether handwritten, typed, printed, electrically, magnetically or otherwise computer stored or accessible, or otherwise visually or aurally reproduced. "Document" shall include all drafts of responsive documents as well as all non-identical copies.

2.      The term "communication" refers to any form of communication and shall include, but shall not be limited to, oral communications, whether in person, by telephone or otherwise, and written communications, whether by letter, e-mail or otherwise, including any form of electronic transmission. Plaintiff expects you to conduct a thorough examination of your e-mails in each request where a communication is requested.

3.      The term "Dreyer's" shall refer to Dreyer's Grand Inc. Cream, Inc. or any representative or agent thereof.

- 3 -

4.    The term "Sterling" shall refer to Sterling Merchandising, Inc. or any representative or agent thereof.

5.    The term "Edy's" shall refer to the ice cream brands "Edy's® Grand Ice Cream," "Edy's® Slow Churned," "Edy's® Loaded," "Edy's® Dibs," "Edy's® Fruit Bars," and "Edy's® Sherbet," and all related ice cream products.

6.    Unless otherwise noted in a request below, this subpoena requires Dreyer's to produce all responsive documents generated on or after <u>January 1, 2002</u>.  If a specific request specifies an earlier date, that date shall control.

## **Document Requests**

1.    Any organizational charts showing name(s), position(s), last known addresses, and the reporting relationships for Dreyer's employees responsible for Edy's brand management, marketing and distribution in the United States and Puerto Rico.

2.    Dreyer's communications sent to and received from Sterling regarding the distribution of Edy's in Puerto Rico, excluding invoices.

3.    Dreyer's communications sent to and received from Payco Foods Corporation, Nestlé S.A., Nestlé Puerto Rico, Inc. or any other Nestlé affiliate regarding Sterling.

4.    All documents regarding the analysis of market data for ice cream products sold in Puerto Rico, including market share information, prices, price trends, sales volume and revenue, retail outlet penetration and related reports, compilations and recommendations.

5.    Quantitative and qualitative market research reports or analysis regarding ice cream products (including Edy's), such as, but not limited to, syndicated research and other market analysis and data purchased from third parties, studies regarding brand loyalty, market simulation, product concept, media plans, market segmentation, price elasticity, consumer

perceptions and behavior analyses of non-price promotional efforts (in-store display and advertising), temporary price reductions, and other market analyses for Puerto Rico and the United States and for Hispanic customers in the United States.

6.    Market studies and reports obtained from A.C. Nielsen, New York, NY, Information Resources, Inc. (IRI), Chicago, IL, and other companies regarding the promotion and sale of Edy's ice cream and other ice cream products.

7.    All documents regarding price increases for Edy's (or decreases in allowances, rebates, or related payments) to both Sterling and other Edy's distributors in the United States and the bases for those increases (or decreases).

8.    All documents regarding payments made to retailers in Puerto Rico for any reason including, but not limited to, slotting allowances, pay-to-stay programs, advertising, shoppers or rebates for product, whether paid directly to retailers or as reimbursement to Sterling.

**EXHIBIT B**

Pursuant to Federal Rules of Civil Procedure 30(b)(6) and 45(a)(2)(B), **YOU ARE COMMANDED** to appear for a deposition upon oral examination of one or more of your officers, directors, managing agents, or other persons designated by Dreyer's who can testify on Dreyer's behalf as to the following topics. In addition, Dreyer's is requested to provide Sterling with written notice, at least ten (10) days in advance of the deposition, of: (1) the name and employment position of each designee who has consented to testify on behalf of Dreyer's; and, (2) the topic category each designee has agreed to testify about.

The deposition will take place on August 21, 2007 at 9:00 a.m. at the offices of Zelle, Hoffman, Voelbel, Mason & Gette LLP, 44 Montgomery Street, Suite 3400, San Francisco, CA 64104, before an officer authorized by law to administer oaths and will continue from day to day thereafter, excluding weekends and holidays, until completed. The deposition will be recorded by stenographic means. Please contact David J. Gilles at (608) 257-3911 if you have questions concerning this subpoena.

Failure to comply with this subpoena may result in punishment for contempt, which may include monetary penalties, imprisonment, and other sanctions.

## Definitions

1.      The term "communication" refers to any form of communication and shall include, but shall not be limited to, oral communications, whether in person, by telephone or otherwise, and written communications, whether by letter, e-mail or otherwise, including any form of electronic transmission.

2.      The term "Dreyer's" shall refer to Dreyer's Grand Ice Cream, Inc. or any employee, representative or agent thereof.

- 6 -

3.    The term "Sterling" shall refer to Sterling Merchandising, Inc. or any representative or agent thereof.

4.    The term "Edy's" shall refer to the ice cream brands "Edy's® Grand Ice Cream," "Edy's® Slow Churned," "Edy's® Loaded," "Edy's® Dibs," "Edy's® Fruit Bars," and "Edy's® Sherbet," and all related ice cream products.

5.    Unless otherwise noted in a topic below, this subpoena requires Dreyer's to produce an individual with knowledge of each topic for the time period of <u>January 1, 2002 to the present</u>. If a specific topic specifies an earlier date, that date shall control.

### Deposition Topics

1.    Dreyer's business relationship with Sterling regarding the distribution and sale of Edy's and other ice cream products within Puerto Rico.

2.    The identity of each Dreyer's employee and/or agent who has been involved with or responsible for the Sterling business relationship including each employee's and/or agent's name, last known address, position, employment responsibility, and the identification of supervisors and reporting relationships for such employees.

3.    Dreyer's communications with Sterling regarding the distribution of Edy's and other ice cream products in Puerto Rico.

4.    Dreyer's communications with Payco Foods Corporation, Nestlé S.A., Nestlé Puerto Rico, Inc. or other Nestle affiliate regarding Sterling's distribution of Edy's ice cream products.

5.    Dreyer's communications with Sterling regarding ice cream distribution in Puerto Rico.

- 7 -

6.    The analysis of market data for ice cream products in Puerto Rico, including market share information, retail prices, retail price trends, sales volume and revenue, retail outlet penetration and related business plans and market strategies.

7.    The identity of each Dreyer's employee and/or agent who has been involved with or responsible for managing the Edy's brand.

8.    The identity of each Dreyer's employee and/or agent who has been involved with or responsible for collecting and analyzing market data and preparing reports and recommendations regarding market strategies including, but not limited to, retail pricing and location selection.

9.    Quantitative and qualitative market research regarding ice cream products (including Edy's), such as, but not limited to, syndicated research and other market analysis and data purchased from third parties, studies regarding brand loyalty, market simulation, product concept, media plans, market segmentation, price elasticity, consumer perceptions and behavior analyses of non-price promotional efforts (in-store display and advertising), temporary price reductions, and other market analyses for Puerto Rico and the United States and for Hispanic customers in the United States.

10.    Marketing strategies regarding Edy's ice cream and other ice cream products involving the payment of retail slotting fees, pay-to-stay fees or other payments to retailers for retail space, other point of sale promotional assistance available to distributors or retailers in Puerto Rico and other markets in the United States, and the identity of employees responsible for the authorization of such payments and assistance.

11.     Market studies and reports obtained from A.C. Nielsen, New York, NY, Information Resources, Inc. (IRI), Chicago, IL, and other companies regarding the promotion and sale of Edy's ice cream and other ice cream products.

12.     Price increases for Edy's (or decreases in allowances, rebates, or related payments) to both Sterling and other Edy's distributors in the United States and the bases for those increases (or decreases).

13.     Payments made to retailers in Puerto Rico for any reason including, but not limited to, slotting allowances, pay-to-stay programs, advertising, shoppers or rebates for product, whether paid directly to retailers or as reimbursement to Sterling.

mn320972_1

# EXHIBIT C

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF PUERTO RICO

3

4    STERLING MERCHANDISING, INC.,        )
                                          )
5                   PLAINTIFF,            )
                                          )
6          VS.                            )NO. 06-CV-1015
                                          )
7    NESTLE, S.A.; NESTLE PUERTO RICO,    )
     INC.; and PAYCO FOODS CORPORATION,   )
8                                         )
                    DEFENDANTS.           )
9    ─────────────────────────────────── )

10

11

12

13          DEPOSITION OF WILLIAM COLLETTE, taken on behalf

14   of the Plaintiff at Howrey LLP, 525 Market Street, Suite

15   3600, San Francisco, California, commencing at 9:14 a.m.,

16   Wednesday, November 14, 2007, before JODY GIBNEY,

17   Certified Shorthand Reporter No. 12308.

18

19

20

21

22

23

24

25

Page 2

```
 1   APPEARANCES:
 2
 3
 4   FOR THE PLAINTIFF:
 5       GODFREY & KAHN S.C.
         One East Main Street
 6       Post Office Box 2719
         Madison, Wisconsin 53701-2719
 7       (608) 257-3911
         BY: DAVID J. GILLES
 8
 9
     FOR THE DEFENDANTS:
10
     HOWREY LLP
11   1299 Pennsylvania Avenue, NW
     Washington, D.C. 20004-2402
12   (202) 383-7046
     BY: CARMINE R. ZARLENGA
13
14
15
16
              --oOo--
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2   EXAMINATION BY MR. GILLES            7
 3
 4
 5          E X H I B I T S
 6   Deposition Exhibits:
 7   No. 1   Second Amended Notice of Combined    9
             Deposition Subpoena and Subpoena Duces
 8           Tecum
             (9 pages)
 9
     No. 2   2001 Plan Summary           14
10           (4 pages)
11   No. 3   December 13, 2001 letter from Bob   18
             Birchbauer to John Williams
12           (1 page)
13   No. 4   Total Ice Cream Category Market Share   20
             Value by Company
14           (4 pages)
15   No. 5   August 20, 2003 e-mail from Robert   28
             Nealis to Thomas@paycofoods.com
16           (1 page)
17   No. 6   August 20, 2003 e-mail from Robert   30
             Nealis to Jorge Sadurni with
18           attachment
             (3 pages)
19
     No. 7   August 28, 2003 e-mail from Thomas   33
20           Ward to Robert Nealis
             (1 page)
21
     No. 8   August 27, 2003 e-mail from Robert   34
22           Nealis to Alberto Romaneschi
             (2 pages)
23
     No. 9   Edy's Grand Ice Cream Confidential   37
24           Price List
             (6 pages)
25
```

Page 4

```
 1   Deposition Exhibits:
 2   No. 10   September 8, 2003 e-mail from Felipe   38
              Silva to Juan Reyes and others with
 3            attached PowerPoint presentation
              (16 pages)
 4
     No. 11   September 22, 2003 e-mail from Stanley   42
 5            Pasarell to Robert Nealis
              (2 pages)
 6
     No. 12   October 16, 2003 e-mail from Felipe   44
 7            Silva to Robert Nealis
              (1 page)
 8
     No. 13   September 10, 2003 e-mail from Ivan   45
 9            Galinovic to Robert Nealis
              (2 pages)
10
     No. 14   April 20, 2004 e-mail from John B.   48
11            Williams to Bob Birchbauer
              (2 pages)
12
     No. 15   May 24, 2004 e-mail from John B.   52
13            Williams to Robert Nealis with
              attachment
14            (4 pages)
15   No. 16   June 9, 2004 e-mail from Tahira Hassan   54
              to Felipe Silva and others re Ice
16            Cream Exports from USA to the
              Caribbean Region
17            (2 pages)
18   No. 17   November 22, 2004 e-mail from Greg   57
              Frick to Robert Nealis
19            (2 pages)
20   No. 18   November 29, 2004 letter from Bob   59
              Birchbauer to John Williams
21            (3 pages)
22   No. 19   e-mail string between Stan Krause and   62
              Robert Nealis and others
23            (2 pages)
24   No. 20   April 7, 2005 e-mail from Stan Krause   68
              to John Williams
25            (1 page)
```

Page 5

```
 1   Deposition Exhibits:
 2   No. 21   June 27, 2005 e-mail from Karen   70
              O'Keefe to Bob Birchbauer and Robert
 3            Nealis
              (6 pages)
 4
     No. 22   August 24, 2005 e-mail from Robert   72
 5            Nealis to Tom Delaplane
              (3 pages)
 6
     No. 23   January 24, 2006 e-mail from Christine   73
 7            Hart to Robert Nealis with attached
              spreadsheet
 8            (5 pages)
 9   No. 24   March 6, 2006 e-mail from Robert   75
              Nealis to Stanley Pasarell
10            (2 pages)
11   No. 25   March 10, 2005 e-mail from Paul Giomi   76
              to Robert Nealis
12            (2 pages)
13   No. 26   March 16, 2006 e-mail from Lee Partin   78
              to Robert Nealis with attached
14            spreadsheet
              (4 pages)
15
     No. 27   March 28, 2006 e-mail from Robert   80
16            Nealis to John Williams
              (2 pages)
17
     No. 28   September 5, 2006 e-mail string   82
18            between Paul Giomi and Sally Graham
              (3 pages)
19
     No. 29   October 6, 2006 e-mail from Paul Giomi   84
20            to Shawn Bovee
              (2 pages)
21
     No. 30   December 21, 2006 e-mail string   86
22            between Paul Giomi and Daniel Kolhoff
              (3 pages)
23
     No. 31   June 5, 2007 e-mail from Paul Giomi to   88
24            Jill Shoemaker
              (1 page)
25
```

WILLIAM COLLETTE

Page 6

Deposition Exhibits:

| No. | | Page |
|---|---|---|
| No. 32 | June 11, 2007 e-mail from Paul Giomi to Ronda Maples (1 page) | 89 |
| No. 33 | July 11, 2007 e-mail string between Paul Giomi and Terri George; Ronda Maples with attachment (4 pages) | 91 |
| No. 34 | Payco Pricing Worksheet (2 pages) | 93 |

Page 8

1    A. That means I'm retired from active service, and I
2    have as a part of my salary continuation obligations to
3    Dreyer's to work on certain matters during that period of
4    time, including the Sterling matter.
5    Q. When did you assume that status?
6    A. As of September 1 of 2007.
7    Q. Could you please describe your -- the positions
8    that you've held during the 20 years that you've worked at
9    Dreyer's?
10    A. I was the treasurer of Dreyer's Grand Ice Cream,
11    Inc., and all the various subsidiaries of Dreyer's Grand
12    Ice Cream. I was responsible for financing, both external
13    financing of the company through third-party-sources
14    banking; I was responsible for investment banking
15    relationships; investor relations; I was responsible for
16    legal interface with outside counsel for Dreyer's during
17    that period of time; and I was responsible for risk
18    management.
19    Q. Briefly, what was your educational background?
20    What is it?
21    A. I'm a graduate of University of California at
22    Berkeley, 1971, in history, and I have an MBA from the
23    University of Minnesota in 1978.
24    Q. Mr. Collette, I'd like to show you what has been
25    marked as Exhibit 1 and ask if you've seen that before.

Page 7

1    San Francisco, California; Wednesday, November 14, 2007
2                9:14 a.m.
3
4                WILLIAM COLLETTE,
5        having been first duly sworn, was
6        examined and testified as follows:
7            EXAMINATION BY MR. GILLES
8        MR. GILLES: Q. Mr. Collette, My name is David
9    Gilles, and I represent the plaintiff in a lawsuit pending
10    in District Court in Puerto Rico involving Sterling
11    Merchandising against Payco Foods and Nestle Puerto Rico,
12    and Nestle, S.A., I think is still on the caption.
13        MR. ZARLENGA: We'll try and get that fixed.
14        MR. GILLES: I understand.
15    Q. It's my understanding, sir, that you're here
16    today in response to a subpoena that was served on
17    Dreyer's Grand Ice Cream, Incorporated?
18    A. That's correct.
19    Q. Would you please state your name, sir?
20    A. It's William Collette.
21    Q. And what is your position with Dreyer's?
22    A. I am or was the treasurer of Dreyer's Grand Ice
23    Cream for 20 years. I am currently on salary continuation
24    with Dreyer's until the middle of 2009.
25    Q. Does that mean that you're retired?

Page 9

1        (Deposition Exhibit 1 was marked for
2        identification.)
3        THE WITNESS: Yes, I have.
4        MR. GILLES: Q. This is an amended notice that
5    was served in this case relating to the deposition of
6    Dreyer's.
7            And I would ask what you've done to prepare for
8    the deposition today, sir?
9    A. Yes. I have over the course of three, three and
10    a half days reviewed the documentation that has been
11    collected in response to the materials that were presented
12    to Dreyer's, by Dreyer's, and I have refreshed my own
13    memory with respect to that documentation and the period
14    of time that it covers. I have discussed the
15    documentation and the matters therein with counsel, and
16    we've had discussions with individuals at Dreyer's that
17    are active employees at Dreyer's now, around that matter.
18    Q. Is Mr. Robert Nealis an active employee of
19    Dreyer's?
20    A. Mr. Robert Nealis is of the same status, in
21    effect, that I am. He is on a salary continuation
22    package.
23    Q. Did you have discussions with Mr. Nealis in
24    preparation for the deposition today?
25    A. No, I did not.

WILLIAM COLLETTE

Page 10

1    Q.  Who specifically did you have discussions with at
2    Dreyer's?
3        A.  I had discussions with Mr. Paul Giomi.
4        Q.  What is Mr. Giomi's position?
5        A.  Mr. Giomi is responsible for international sales,
6    certain aspects of international sales relationships for
7    Dreyer's Grand Ice Cream, Inc.
8        Q.  Who else did you speak with?
9        A.  I did not speak with anyone else specifically at
10   Dreyer's now.
11       Q.  And you are prepared to testify with respect to
12   the matters outlined in the Exhibit 1?
13       A.  Yes, I am.
14       Q.  Could you briefly describe Dreyer's business?
15       A.  Yes.  Dreyer's is a manufacturer and distributor
16   of ice cream products, packaged ice cream products and
17   novelty ice cream products, to the grocery trade and to
18   other classes of trade in the United States and in certain
19   foreign markets.
20       Q.  And is -- what are Dreyer's primary brands that
21   it distributes and manufactures?
22       A.  Dreyer's primary brands are Dreyer's Grand Ice
23   Cream, in the Western states -- that's a premium ice
24   cream, packaged premium ice cream -- Edy's Grand Ice
25   Cream, in the Eastern United States, a premium ice cream;

Page 11

1    Haagen-Dazs, which is a superpremium ice cream; the Nestle
2    novelties, including Nestle Crunch, Drumstick, and other
3    brands; certain light ice cream brands; SlowChurned, which
4    is a packaged premium product.
5        Q.  And is a light ice cream brand marketed under the
6    name Dreyer's and Edy's?
7        A.  Yes, Dreyer's SlowChurned.  That would be a
8    subbrand under Dreyer's or Edy's.
9        Q.  And is it, my understanding, correct that Edy's
10   is the number one national brand in terms of sales in the
11   United States, the domestic United States?
12       A.  I believe -- I believe that Dreyer's and Edy's
13   taken together are the largest selling brand in the United
14   States.
15       Q.  I would like to direct your attention to the
16   distribution of ice cream in Puerto Rico.
17       A.  Um-hm.
18       Q.  Did there come a time in the early 1990s when
19   Dreyer's became interested in distributing Edy's in Puerto
20   Rico?
21       A.  Yes.
22       Q.  Could you describe how that took place?
23       A.  I can describe to you the result of that
24   interest, not precisely how it came about.  But Dreyer's,
25   in fact, established a relationship in Puerto Rico in the

Page 12

1    early '90s for the distribution of Edy's through a
2    distributor, then Dynamic Merchandise.
3        Q.  And did that distributor change its name over
4    time?
5        A.  I don't know if that's the precise -- precisely
6    correct way to state it.  Dynamic Merchandise then
7    assigned, with Dreyer's consent, the distribution of ice
8    cream in Puerto Rico to Sterling Merchandise.
9        Q.  The person that Dreyer's was dealing with for
10   Dynamic was John Williams?
11       A.  Yes.  I believe that's correct.
12       Q.  And he continued to be the primary contact for
13   Sterling Merchandise?
14       A.  Yes.  That's what the documentation reflects.
15   That's correct.
16       Q.  That relationship has continued until today?
17       A.  Yes.
18       Q.  In addition to distributing, the relationship
19   with Sterling Merchandising, today Dreyer's also has a
20   relationship with another ice cream distributor in Puerto
21   Rico?
22       A.  Dreyer's.  Yes, that's correct.
23       Q.  And that's Payco Foods Corporation?
24       A.  Yes, that's correct.
25       Q.  And how long has Dreyer's had that relationship?

Page 13

1        A.  That relationship has been in place since 2004, I
2    believe.
3        Q.  Was that a consequence of the combination of
4    Dreyer's and Nestle in -- the transaction, I believe,
5    began in 2002 and was finally approved in 2004 by the
6    Federal Trade Commission.
7        MR. ZARLENGA:  I'll object to the vagueness of
8    that question and lack of proper foundation.
9        THE WITNESS:  The transaction -- you have to
10   let -- help me out in terms of how you want that
11   transaction described.
12       MR. GILLES:  Q.  How would you describe that
13   transaction, sir?
14       A.  Dreyer's and Nestle entered into an agreement in
15   2002 that was subsequently closed in June of 2003 whereby
16   Dreyer's Grand Ice Cream, Inc., acquired the Nestle Ice
17   Cream Company in the United States for newly issued stock
18   which resulted in Nestle owning 66 percent of the common
19   equity of Dreyer's Grand Ice Cream and 33 percent of
20   common equity continuing to be held by public shareholders
21   through Dreyer's security that was issued in trading on
22   NASDAQ.
23       Q.  Did there come a point in time following that
24   when Nestle acquired the balance of the stock that was
25   publicly traded?

WILLIAM COLLETTE

Page 14

1    A. The shareholders -- the public shareholders
2  received, in the 2003 transaction, a one-for-one exchange
3  of stock that included on it a put right, at the option of
4  the shareholders, to put the stock to Dreyer's in --
5  beginning at a period beginning at the beginning of 2006
6  for a fixed price. And that put period matured, became
7  available at the beginning No. 2006, at which time a
8  sufficient number of shareholders put their stock such
9  that Nestle became the owner of 100 percent of the common
10 equity of Dreyer's on January 18, 2006.
11   Q. And earlier you mentioned it was in 2004 that
12 Dreyer's began its relationship with Payco in Puerto Rico.
13   A. I believe that it was 2004.
14   Q. In addition to distributing through independent
15 distributors, does Dreyer's also distribute through its
16 own distribution channels?
17   A. Yes.
18     (Deposition Exhibit 2 was marked for
19     identification.)
20     MR. GILLES: Q. I would like to show you what's
21 been marked as Exhibit No. 2, which is Dreyer's No. 2133
22 through Dreyer's 2136, and ask if you could identify that.
23   A. This looks to me to be an annual plan for the
24 southeast division of Dreyer's.
25   Q. So it's a projection of sales for a future time

Page 15

1  period?
2    A. It looks like it's the final plan for 2001.
3    Q. And this would have been prepared sometime in
4  January of 2001?
5    A. It would have been finalized in January 2001. It
6  would have been prepared in the preceding quarter.
7    Q. And could you generally describe what the
8  function of the plan is?
9    A. The function of the plan is to plan for the
10 sales, expenses, and results of the division, in this case
11 the southeast division, for the calendar year 2001.
12   Q. And I note on the left-hand column -- could you
13 describe what's set out, just generally, in the left-hand
14 column on the first page of the exhibit, under "2001 Plan
15 Summary"?
16   A. It's generally an income statement format that
17 summarizes the planned volume and expenses for the year.
18   Q. And then to the right of that, there are any
19 number of columns. Could you -- at the head of each
20 column, you see "Atlanta," "Alabama," "Miami"?
21   A. Yes.
22   Q. Would you identify what's represented in those
23 columns, please?
24   A. Those columns are markets where Dreyer's has its
25 own company-owned distribution.

Page 16

1    Q. And as we proceed to the right on the page, I see
2  a column that's headed "CO Owned." Does that mean company
3  owned?
4    A. Yes, it does.
5    Q. And that would be the total of the columns to the
6  left?
7    A. Correct.
8    Q. And continuing to the right on the page, what is
9  shown there in terms of distribution, in terms of the
10 distribution plan?
11   A. Those are independent distributors operating
12 within the southeast division.
13   Q. So going to the column about two-thirds of the
14 way over, I see "Puerto Rico." Does that concern Sterling
15 Merchandising?
16   A. Yes.
17   Q. Would any other entity be included in that
18 column?
19   A. Not that I'm aware of.
20   Q. Does it -- if we look down the page at -- under
21 "Expenses," under the "201 Plan Summary," I see the
22 heading "Expenses."
23     Do you see that?
24   A. Um-hm.
25   Q. And I note under the first column, for example,

Page 17

1  for Atlanta, there's a figure, 2,242. Is that -- that, I
2  take it, is in dollars?
3    A. Yes.
4    Q. Is it in thousands of dollars or --
5    A. Yes.
6    Q. And I note if we go over to the column under
7  "Puerto Rico," there's a 0 indicated.
8     Do you see that?
9    A. Correct.
10   Q. What accounts for the difference?
11   A. The column you previously referred to is a
12 company-owned route structure where the company owns,
13 operates, and is responsible for the expenses associated
14 with the distribution of ice cream in that market, so
15 route expenses there would be the cost of driving the
16 trucks and using those trucks in that particular market.
17     In Puerto Rico, Puerto Rico is an independent
18 distributor and those expenses are borne by the
19 independent distributor.
20   Q. What are the terms of sale that Dreyer's has with
21 Sterling Merchandising for product?
22   A. I believe that the terms are described in the
23 documents generally. I don't know exactly what the terms
24 of sales are from memory.
25   Q. Sure. In preparation for today, sir, did you

WILLIAM COLLETTE

Page 18

1  review the documents which Mr. Nealis produced?
2     A. I reviewed all the documents that were produced
3  that were responsive to the various categories here.
4        (Deposition Exhibit 3 was marked for
5        identification.)
6        MR. GILLES: Q. Mr. Collette, I'd like to show
7  you what we've marked as Exhibit No. 3. Can you, first of
8  all, identify who Mr. Bob Birchbauer is?
9     A. Mr. Birchbauer is a general manager at that time
10 in the southeast division.
11    Q. And was he -- what was his responsibility with
12 respect to Sterling Merchandising?
13    A. He had a direct relationship with Sterling for
14 the distribution of ice cream through the southeast
15 division to Sterling.
16    Q. Who did Mr. Birchbauer report to?
17    A. He reported to Greg Frick.
18    Q. And what was Mr. Frick's position?
19    A. He was the division manager, southeast division.
20    Q. Was he located in Florida?
21    A. Yes, he was.
22    Q. Who did Mr. Frick report to? Again, this is
23 2001.
24    A. He reported to Mr. Tom Delaplane.
25    Q. What was Mr. Delaplane's position?

Page 19

1     A. He was the vice president of sales, Dreyer's
2  Grand Ice Cream.
3     Q. Did Mr. Birchbauer have anyone working for him
4  that interacted directly with Sterling Merchandising?
5     A. He would have had people in his organization that
6  were responsible for the execution of the order and
7  delivery of products to Puerto Rico.
8     Q. If someone had a question about whether the
9  number of items ordered corresponded with the bill, they
10 probably would speak with someone in Mr. Birchbauer's
11 organization?
12    A. Yes, that's correct.
13    Q. In the first paragraph, sir, it refers to EDLP.
14 Do you have an understanding of what that means?
15    A. Yes.
16    Q. Would you explain that to me?
17    A. That is a industry term in the grocery industry
18 that means everyday low price.
19    Q. Does it contrast with another approach that might
20 be implemented with the sale of grocery items?
21    A. I'm not sure exactly what you -- what do you
22 mean, "contrast with"?
23    Q. Well, if -- it talks about initiating the EDLP,
24 and I'm wondering what -- what was in place before the
25 EDLP was initiated?

Page 20

1     A. I'm not aware, and I don't think the documents
2  will reflect exactly what was in place in that same
3  terminology.
4     Q. So it means everyday low pricing?
5     A. Everyday low price.
6     Q. Low price?
7     A. Yes.
8     Q. When -- under an EDLP program, does -- from time
9  to time do specific products go on sale? Special?
10    A. Typically, no. The term suggests that the
11 pricing strategy at the retail level is to have the low
12 price every day, and that's literally what it means.
13       (Deposition Exhibit 4 was marked for
14       identification.)
15       MR. GILLES: Q. Mr. Collette, I'd like to show
16 you what's been marked as Exhibit No. 4 and ask if you can
17 identify that, please. Exhibit No. 4, excuse me, bears
18 Bates No. Dreyer's 2413 through Dreyer's 2416.
19    A. This appears to be a Nielsen market-share report,
20 followed by some analytical graphics associated with it.
21    Q. Directing your attention to the first page, I
22 note at the bottom it says "Copyright ACNielsen PR."
23       Do you see that?
24    A. Yes, I do.
25    Q. Does that mean that this document is from Nielsen

Page 21

1  in Puerto Rico?
2     A. I -- I do not know that. I do not know what the
3  PR stands for there.
4     Q. Does Dreyer's have a regular arrangement with
5  Neilsen for market information?
6     A. At the time this document was produced, if this
7  means in 2003, yes.
8     Q. What arrangement was that?
9     A. They had a -- Nielsen provided market-share
10 information at the -- under an arrangement with Dreyer's
11 or under a contract with Dreyer's that specified what it
12 was.
13    Q. And was that provided for the -- what geographic
14 territories were the subject of that information?
15    A. I'm not specifically aware, other than it was for
16 the United States.
17    Q. Do you know whether Dreyer's obtained regular
18 reports regarding market shares in Puerto Rico?
19    A. I don't know.
20    Q. Who at Dreyer's would know that?
21    A. I'm not aware of people who are at Dreyer's now
22 that would know that as of 2003, so I don't know.
23    Q. Who has -- who worked at Dreyer's in the past
24 that would know that?
25    A. Mr. Nealis.

6 (Pages 18 to 21)

WILLIAM COLLETTE

Page 22

1   Q. Mr. --
2   A. Mr. Nealis.
3   Q. -- Nealis.
4       In terms of this document, directing your
5   attention to the top of the columns where it says "Year
6   Ending On" and then there's "JJ 2001."
7       Do you see that?
8   A. Yes.
9   Q. Can you explain to me what that means?
10  A. I don't know what those particular column
11  headings mean.
12  Q. And if you will, direct your attention to the
13  next page of the exhibit.
14  A. Um-hm.
15  Q. I would note that it appears to have the same
16  title on the top of the page as the preceding page, but
17  the amounts in the columns are different.
18      Do you see that?
19  A. Yes.
20  Q. Do you know what accounts for that?
21  A. No.
22  Q. Who at Dreyer's would know how to interpret these
23  reports?
24  A. Same -- same basic response on that.
25  Q. Mr. Nealis?

Page 23

1   A. Yes.
2   Q. In terms of market information that Dreyer's
3   would get on a routine basis, could you describe to me
4   generally what resources Dreyer's had for that from, let's
5   say, the period 2001 through 2004.
6       MR. ZARLENGA: I'll object to the form of that
7   question as vague and overbroad.
8       MR. GILLES: Q. I'll restate the question.
9       Mr. Collette, does Dreyer's have a -- employees
10  who are involved in market research?
11  A. Yes.
12  Q. And does it have a particular division within the
13  company? How are those employees organized, sir?
14  A. There are employees who would look at
15  market-share data for various purposes in sales groups and
16  marketing groups.
17  Q. Is there an organization within Dreyer's that is
18  called marketing?
19  A. Yes.
20  Q. And how many -- again, during 2001 to 2004, how
21  many employees were in that group and what generally did
22  they do?
23  A. I don't -- I couldn't tell you specifically how
24  many people were in a group because there was no
25  particular group of that designation as you're describing

Page 24

1   it.
2   Q. How was it designated?
3   A. It wasn't designated like that.
4   Q. Were people that did -- I mean, we've been
5   talking about market research.
6   A. Right.
7   Q. What do you understand by "market research,"
8   Mr. Collette?
9   A. I understand that market research is presenting
10  the presence of a particular brand or product in a market.
11  Q. Who -- and who would undertake that at Dreyer's?
12  A. That would be undertaken specifically by whoever
13  was using the information. As I mentioned a moment ago,
14  that could be in sales or marketing.
15  Q. Did -- in analyzing the market, did Dreyer's
16  conduct or arrange to conduct consumer behavior studies to
17  determine a customer's preference with respect to ice
18  cream?
19      MR. ZARLENGA: I'm going to object to the scope
20  of that question as overbroad both in respect to geography
21  and time frame.
22      MR. GILLES: Q. I'll reframe the question.
23      During the time from 2001 to 2005, did Dreyer's
24  conduct consumer attitude and usage studies or behavior
25  studies to determine their receptiveness to purchasing

Page 25

1   Edy's ice cream?
2       MR. ZARLENGA: Same objection as to the
3   geographic scope of the question.
4       MR. GILLES: Q. Please respond.
5   A. I -- broadly, yes.
6   Q. Who -- did Dreyer's have people that actually did
7   that?
8   A. Yes.
9   Q. Did you perform focus group studies?
10  A. Well, yes, generally. If you are asking about
11  Edy's, generally, yes.
12  Q. What other types of studies did you perform --
13  did Dreyer's perform?
14  A. What other type of --
15  Q. Studies, market studies.
16  A. -- marketing studies?
17  Q. Yes.
18  A. I'm trying to think of a different one other than
19  focus groups and data analyses.
20  Q. By "data analyses," that would mean looking at
21  information about sales -- product sales and sales of
22  other brands that had been compiled?
23  A. Yes.
24  Q. Did Dreyer's have studies where they would ask
25  questions of people at grocery stores about their

WILLIAM COLLETTE

Page 26

1  preference with respect to ice cream?
2      MR. ZARLENGA:  Let me just make an objection to
3  these questions to the extent you're going beyond Puerto
4  Rico. I'm just objecting to the scope of the questions.
5      The witness will give his answers, but I don't --
6  I think it's beyond the scope of the notice and I think
7  the questions are objectionable, so I want to note that
8  for the record.
9      MR. GILLES:  I disagree.
10     Q.  So with respect to -- you mentioned focus groups?
11         Has Dreyer's conducted interviews, attempted to
12  survey consumers about their ice cream purchasing habits?
13     A.  I'm not aware of any specifically.
14     Q.  Has Dreyer's conducted elasticity studies to see
15  the effect of varying the price of its product on sales?
16     A.  Where?
17     Q.  Well, in Puerto Rico.
18     A.  Not that I'm aware.
19     Q.  In the United States?
20     A.  Yes.
21     Q.  In what markets in the United States?
22     A.  I'm not specifically aware of that.
23     Q.  Okay.  When was that done?
24     A.  That process, I'm not aware of specific dates
25  unless it's reflected in here.

Page 27

1      Q.  Has -- does Dreyer's continue to do that today?
2      A.  Yes.
3      Q.  Can you describe to me how it approaches that --
4  that effort?
5      A.  I'm not sure what you mean by "approaches the
6  effort."
7      Q.  What process it uses to evaluate the price points
8  of ice cream.
9      A.  Using the kind of data that is collected both
10  from the sale, through it own records, and through market
11  data collected by various firms such as Nielsen.
12     Q.  Who's responsible for analyzing the information
13  at Dreyer's?
14     A.  Are you referring to what time period?
15     Q.  Today.
16     A.  Today.  Broadly -- seems like it would be a
17  simple question, but it's not.
18         Those in charge of whatever the particular market
19  would be.
20     Q.  If -- if Mr. Williams had a question regarding
21  the pricing of his product, who would he contact at
22  Dreyer's concerning that?
23     A.  He would direct them, I would -- I would
24  believe -- I don't know the specific answer to that, but I
25  believe he would direct it to his relationship, most

Page 28

1  direct relationship with Dreyer's.
2      Q.  And today, who is that?
3      A.  I'm not aware of who that is today.
4      Q.  In the past, it would have been, for example,
5  Robert Birchbauer?
6      A.  Yes.
7      Q.  Does Mr. Giomi have -- strike that.
8          I'd like to direct your attention to the third
9  page of the exhibit, sir.
10     A.  Um-hm.
11     Q.  And I note at the bottom right of the page it
12  says "Appendix B."  Do you have an idea of what this was
13  an appendix to?
14     A.  I do not.
15     Q.  And do you have any information about how this
16  was prepared?
17     A.  No, I do not.
18     Q.  Do you know who had custody of this document that
19  resulted in it being produced to the plaintiff in this
20  case?
21     A.  Specifically, no, I do not.
22         (Deposition Exhibit 5 was marked for
23         identification.)
24     MR. GILLES:  Q.  Mr. Collette, I'd like to show
25  you what we've marked as Exhibit No. 5 and ask if you can

Page 29

1  identify this, please.
2      A.  Yes.  This is an e-mail from Robert Nealis to
3  Mr. Thomas at Payco Foods, in August of 2003.
4      Q.  And Mr. Nealis was the -- his position, again,
5  was director of international sales.  Am I correct?
6      A.  Correct.
7      Q.  And in the first line it refers to an individual,
8  Jorge Sandurni.  Do you see that?
9      A.  Um-hm, yes.
10     Q.  Who is Mr. Sadurni?
11     A.  Mr. Sadurni is an employee of Nestle S.A., I
12  believe.
13     Q.  What was his position in 2003?
14     A.  I'm not sure precisely what it was.
15     Q.  In the -- if you would, please, sir, please read
16  the e-mail.
17     A.  Um-hm.
18     Q.  In the second sentence Mr. Nealis states,
19  "Dreyer's purchase of the Nestle ice cream business in the
20  USA clearly increases the need to explore further
21  synergies for our respective companies."
22     A.  Yes.
23     Q.  Do you know what he's referring to in that
24  sentence?
25     A.  He's referring to potential synergies between

WILLIAM COLLETTE

Page 30

1  Dreyer's and Nestle.
2      Q.  And how does that -- how does that come to bear
3  in Puerto Rico at the time?  What synergies?  Directing
4  your attention, then, to the reference to the e-mail from
5  Thomas Ward, do you see that in the first sentence?
6      A.  Oh, yes, okay.
7      Q.  Did you -- did you come across an e-mail from
8  Mr. Ward that this is referencing?
9      A.  I may have.  I'm not sure exactly what it's
10  referencing, upon reading this.  I'm not aware.
11      Q.  In the first sentence it refers to "potential
12  opportunities in the Puerto Rico market."
13          Do you know what is being referred to?
14      A.  Not specifically.
15          (Deposition Exhibit 6 was marked for
16          identification.)
17      MR. GILLES:  Q.  Mr. Collette, I usually begin a
18  deposition by saying that in the event you want to take a
19  break for any reason you should feel free to tell me, and
20  we'll take a break.  Or if you don't understand a question
21  I ask, let me know and I'll reframe it so that we're
22  certain we're communicating.
23          Have you, sir, been deposed before?
24      A.  No, I have not been deposed.
25      Q.  I would like to show you, then, Mr. Collette,

Page 31

1  what's marked as Exhibit 6.
2          Would you please identify this?
3      A.  An e-mail from Robert Nealis to Jorge Sadurni, in
4  August of 2003.
5      Q.  Now, at that time you were an active employee
6  with Dreyer's?
7      A.  Yes, I was.
8      Q.  Were you involved in the transaction with Nestle?
9      A.  Yes, I was.
10      Q.  Did you have occasion to meet personally
11  Mr. Sadurni?
12      A.  No, I did not.
13      Q.  Do you know where he was employed by Nestle?
14      A.  No.  I believe he's an employee of Nestle S.A.,
15  which would suggest that he's in Switzerland.
16      MR. ZARLENGA:  I'm going to object to the scope
17  of the questions about Nestle employees as beyond the
18  scope of the deposition notice.
19      MR. GILLES:  Q.  Please read the e-mail.
20          Directing your attention to the first paragraph
21  and the last sentence in that paragraph, Mr. Nealis
22  states, "As you will see, it's a soft reply because I need
23  your guidance and consideration in order to proceed."
24          Did -- what relationship did Mr. Nealis have with
25  Mr. Sadurni that he would need his guidance or

Page 32

1  consideration to proceed with the matter?
2      MR. ZARLENGA:  I'm going to object to the form of
3  the question as calling for speculation.
4      THE WITNESS:  I'm not aware specifically of the
5  relationship.  Mr. Sadurni works generally in the area of
6  Nestle where Puerto Rico would fall under its particular
7  scope.  The ice cream business -- excuse me, let me be
8  specific, the ice cream business in Puerto Rico.
9      MR. GILLES:  Q.  And then directing your
10  attention to the second paragraph, the third sentence
11  states, "I've spoken to the key individuals involved and
12  determined they would entertain a transaction governed by
13  following principles."
14          Do you have any understanding of what transaction
15  they were considering at the time?
16      A.  I don't have a specific knowledge of what
17  transaction was being contemplated.
18      Q.  In the -- in the third paragraph of the e-mail,
19  the final sentence says, "I would be prepared to
20  facilitate as necessary and to be certain Dreyer's
21  interests are considered under any assignment restructure
22  of our overseas distribution."
23          Do you know what is meant by "facilitate" in that
24  sentence?
25      A.  I would presume that Mr. Nealis means facilitate

Page 33

1  a communication between the interested parties.
2      Q.  Do you know whether Mr. Nealis received a
3  response from Mr. Sadurni to this e-mail?
4      A.  I do not know.
5      Q.  Mr. Collette, I'd like to direct your attention
6  to the second page of the exhibit and ask if you can
7  identify that, please.
8      A.  This appears to be a -- reflect the market share
9  of various brands in Puerto Rico -- and sales, it appears,
10  as well.
11      Q.  This again is prepared by ACNielsen PR?
12      A.  Yes.  That's what it appears to be.
13          (Deposition Exhibit 7 was marked for
14          identification.)
15      MR. GILLES:  Q.  Mr. Collette, I'd like to show
16  you what we've marked as Exhibit No. 7 and ask if you
17  would identify that, please.
18      A.  This is an e-mail from Thomas Ward, Payco Foods,
19  to Robert Nealis, copy to Jorge Sadurni.  This is
20  August 28, 2003.
21      Q.  May I see the exhibit, please?
22          Do you know who Mr. Ward is?
23      A.  Yes.
24      Q.  Who is he?
25      A.  He is the head of Payco Foods.

WILLIAM COLLETTE

Page 34

1    Q.  Have you ever met Mr. Ward?
2    A.  No, I have not.
3        (Deposition Exhibit 8 was marked for
4        identification.)
5    MR. GILLES:  Q.  Showing you what's marked as
6  Exhibit No. 8, would you identify that, please.
7    A.  This is an e-mail from Robert Nealis to Alberto
8  Romaneschi, with copies to Tom Delaplane and Gary Rogers,
9  dated August 27, 2003.
10    Q.  Who is Gary Rogers?
11    A.  Gary Rogers is the chairman and CEO of Dreyer's
12  Grand Ice Cream.
13    Q.  And who is Alberto Romaneschi?
14    A.  Romaneschi.  He was at the time of this e-mail
15  the chief financial officer of Dreyer's Grand Ice Cream.
16    Q.  How long had he held that position?
17    A.  At the time of this e-mail, approximately six
18  months.
19    Q.  Do you know where he had worked before?
20    A.  He had worked for a joint venture of Nestle,
21  called Cereal Partners.
22    Q.  And where was that located?
23    A.  It was located in Switzerland.
24    Q.  And how long did he continue to hold that
25  position with Dreyer's?

Page 35

1    A.  For approximately one more year.
2    Q.  I note at the bottom of the exhibit there appears
3  to be a copy.  It's an e-mail chain, and there appears to
4  be an e-mail that had been sent from Mr. Romaneschi to
5  Mr. Nealis with a copy to Mr. Delaplane, dated August 26,
6  2003.
7        Do you see that?
8    A.  Yes, I do.
9    Q.  So the e-mail at the top is in response to the
10  e-mail which Mr. Romaneschi sent?
11    A.  Yes.
12    Q.  I would direct your attention to -- please read
13  the e-mail.
14        Mr. Collette, directing your attention to the
15  fourth point, it says, "Our annual profit is above 500" --
16        Does that mean $500 million?
17    A.  No.  500,000.
18    Q.  500,000.
19        -- "after marketing support of 0.75 per customer
20  unit"?
21    A.  Consumer unit, yes.
22    Q.  Consumer unit.
23        Then directing your attention to the next
24  numbered point, No. 5, about the fourth sentence it
25  states, "Furthermore, the market needs some level of

Page 36

1  'rationalization.'"
2        Do you see that?
3    A.  Yes, I do.
4    Q.  Do you know what Mr. Nealis means by that?
5    A.  I don't know what he's referring to there.
6    Q.  Do you have a sense of what the term
7  "rationalization" means with respect to a market?
8    A.  Not specifically, not in this context, no.
9    Q.  And continuing in the paragraph, there's a
10  sentence that says, "It seems to me that we have the
11  opportunity to consolidate distribution for our collective
12  products at a very minimum."
13        Do you see that?
14    A.  Yes, I do.
15    Q.  And is he referring to consolidating distribution
16  going to both Payco and Sterling?
17    MR. ZARLENGA:  Object to the form of the
18  questions, calls for speculation, and lacks foundation.
19    THE WITNESS:  I don't know what he's referring
20  to.
21    MR. GILLES:  Q.  In 2003, were you directly
22  involved in any discussions with Mr. Nealis about
23  distribution in Puerto Rico?
24    A.  No.
25    Q.  That wouldn't have come to your attention

Page 37

1  directly in terms of your responsibilities, would it?
2    A.  No.  It was too small.
3        (Deposition Exhibit 9 was marked for
4        identification.)
5    MR. GILLES:  Q.  Showing you what we've marked as
6  Exhibit No. 9, would you please identify that.
7    A.  This is a price list for Edy's Grand Ice Cream
8  for the Puerto Rico market.  Looks like it's dated
9  effective in August of 2002.  Actually, that's unclear to
10  me; there are various dates on here.
11    Q.  Um-hm.
12    A.  I'm not sure when it's effective.
13    Q.  This is a document that Dreyer's would generate?
14    A.  Yes.
15    Q.  And it shows the price list to Edy's at or -- at
16  the time that is indicated on the document?
17    A.  Yes.  I'm not certain what time that is, though,
18  from the caption in the upper right.
19    Q.  It says "confidential price list."  At the time,
20  I take it that if someone other than Sterling were to
21  contact Dreyer's, you would not provide information, a
22  price list in response to a request for that.
23    MR. ZARLENGA:  Let me object to the question as
24  beyond the scope of the deposition notice and overbroad,
25  also calling for speculation.

WILLIAM COLLETTE

Page 38

1    THE WITNESS: I don't know the answer to that
2    specifically.
3    (Deposition Exhibit 10 was marked for
4    identification.)
5    MR. GILLES: Q. I would like to show you what
6    we've marked as Exhibit No. 10, which consists of Dreyer's
7    2364 through Dreyer's 2379, the first pages of which
8    appear to be an e-mail chain or two e-mail chains, and the
9    last pages, beginning on Page 2368, appear to be a
10   PowerPoint.
11   Can you identify this, please.
12   A. This is an e-mail from Felipe Silva, who's a
13   market head for Nestle, to individuals at Nestle whom I
14   don't know, and Mr. Ward. This is dated Monday,
15   September 8, 2003, and the e-mail's also copied to other
16   individuals at Nestle.
17   Q. It includes a copy to Mr. Nealis, correct?
18   A. Yes, it does.
19   Q. And it concerns a Dreyer's meeting in Puerto
20   Rico?
21   A. That's the subject line, yes.
22   Q. Directing your attention to the fourth page of
23   the exhibit, which is --
24   Can you identify that, please?
25   A. I'm sorry. I'm not --

Page 39

1    Q. It's probably the first page.
2    A. Four, this one is four.
3    Q. Page 5, it's Page 5.
4    A. Okay. This is a title page to a presentation,
5    dated September 4, 2003, and the title is "Nestle and
6    Dreyer's Caribbean Region Discussion."
7    Q. Do you know who prepared this document?
8    A. I don't know who prepared the document.
9    Q. Do you know if -- whether or not the presentation
10   was actually made?
11   A. I do not know that specifically.
12   Q. All of what you could offer by way of testimony
13   about this document today is based on your review of it?
14   A. That's correct.
15   Q. Directing your attention to the next page, which
16   is Dreyer's 2370, would you review that, please.
17   A. 2370? My next one was 69, but --
18   Q. I'm sorry.
19   Directing your attention to Page 2370, which is
20   the third page of the slides --
21   A. Um-hm.
22   Q. -- and it's captioned "International Overview."
23   Do you see that?
24   A. Yes, I do.
25   Q. And there are a number of bullet points, and I

Page 40

1    would direct your attention to the second to the last
2    bullet point where it notes "leverage existing
3    manufacturing capacity."
4    A. Yes.
5    Q. Can you explain what that means?
6    A. No, I can't.
7    Q. Directing your attention to the next page of the
8    exhibit, Dreyer's 2371.
9    A. Yes.
10   Q. And that page is entitled "Puerto Rico"; is that
11   correct?
12   A. Yes.
13   Q. And then directing your attention to the second
14   to the last bullet point, it says, "Confusing brand
15   alliances between primary distributors."
16   Do you see that?
17   A. Yes, I do.
18   Q. Do you know what's meant by that?
19   A. At that time -- at that time, Sterling was the
20   distributor of Edy's and Ben & Jerry's. Edy's was
21   Dreyer's product; Dreyer's was owned two-thirds by Nestle
22   at the time of this. Ben & Jerry's was owned by Unilever,
23   Nestle's worldwide rival.
24   At the same time, Payco Foods, which was
25   affiliated with Nestle -- although I'm not precisely sure

Page 41

1    whether they were owned by Nestle at that time -- was
2    distributing Breyers, owned by Unilever; and Haagen-Dazs,
3    which was -- at that time was owned by -- the
4    international rights, I believe, General Mills.
5    Q. The distributor of a Nestle -- let me start over.
6    Why was that confusing?
7    A. Because the distributor that was owned or
8    controlled by Nestle, Payco Foods, was distributing for
9    Unilever, Nestle's rival; and the distributor of the
10   Dreyer's, or that was -- had a relationship with Dreyer's,
11   which was then owned two-thirds by Nestle, was
12   distributing both Dreyer's products and products owned by
13   Unilever.
14   Q. So Nestle is competing against itself?
15   A. I guess that's one way to interpret it, yes.
16   Q. Were you involved in any discussions to try and
17   deal with this confusion?
18   A. Not at that time.
19   Q. Since that point in time have you been involved
20   in discussions regarding that matter?
21   A. No, I have not.
22   Q. Are you aware of any other market where Dreyer's
23   finds itself in that confusing situation that you just
24   described?
25   A. Yes.

11 (Pages 38 to 41)

WILLIAM COLLETTE

Page 42

1    Q.  Where is that market?
2    A.  China, Hong Kong.  Both those markets.
3    Q.  Were distributors that you -- that are involved
4  in distributing Dreyer's product also distributing
5  Unilever's product?
6    A.  Or vice versa, yes.
7        (Deposition Exhibit 11 was marked for
8        identification.)
9        MR. GILLES:  Q.  Showing you what we've marked as
10  Exhibit No. 11, can you identify that, please.
11    A.  Yes.  This is an e-mail from Stanley Pasarell to
12  Robert Nealis, September 22, 2003.  Subject, it appears to
13  be a forward of an e-mail regarding Puerto Rico.
14    Q.  And this exhibit, Exhibit 11, has Dreyer's
15  No. 520 and 521.  And directing your attention halfway
16  down the page, this appears again to be an e-mail chain.
17  Lower on the page there is an e-mail from Robert Nealis to
18  Stanley Pasarell regarding Puerto Rico, dated
19  September 20, 2003; is that correct?
20    A.  Yes, that's correct.
21    Q.  Who is Stanley Pasarell?
22    A.  Stanley Pasarell is an investor in certain
23  businesses.  Dreyer's has a distribution relationship with
24  him in Chile, and he was a partial investor, I believe, in
25  the business in Puerto Rico.

Page 43

1    Q.  The e-mail from Mr. Pasarell to Mr. Nealis
2  appears to be confirming a meeting that's to take place in
3  the future; is that correct?
4    A.  That's what it appears, yes.
5    Q.  Do you know what the subject of the meeting was?
6    A.  Puerto Rico.  Other than that, no, I don't.
7    Q.  At this point in time in September of 2003, did
8  Mr. Nealis on behalf of Dreyer's have a number of
9  conversations with Stanley Pasarell and John Williams
10  regarding the potential acquisition of Sterling
11  Merchandising?
12    A.  I'm not aware specifically of conversations
13  Mr. Nealis had in that period of time.  I'm only aware of
14  what the record reflects in terms of the exchanges of
15  documents.
16    Q.  Isn't that something that would have come to your
17  attention in your position as secretary of Dreyer's?
18    A.  I was not the secretary of the corporation.  The
19  general counsel was the secretary of the corporation.
20    Q.  But you were -- I'm sorry, I forgot your title.
21    A.  I was the treasurer.
22    Q.  Treasurer.  In your position as treasurer and
23  responsible for banking relationships and financing and so
24  on, isn't that something that would have come to your
25  attention?

Page 44

1    A.  Not necessarily.  It would depend on the stage of
2  the discussion.
3        (Deposition Exhibit 12 was marked for
4        identification.)
5        MR. GILLES:  Q.  Showing you what's been marked
6  as Exhibit 12, could you please identify that.
7    A.  This is an e-mail from Felipe Silva, the head of
8  marketing for Nestle, to Robert Nealis, October of 2003,
9  and there's no subject.
10    Q.  In the -- and this again has another e-mail below
11  it, does it not?
12    A.  Yes.
13    Q.  That e-mail is from Mr. Nealis to Felipe Silva,
14  dated October 11, 2003, correct?
15    A.  That's correct.
16    Q.  Referring, though, to Mr. Silva's e-mail, it's
17  addressed to Bob, and the first word of the text says
18  "Vevey."
19        Do you see that?
20    A.  Yes.
21    Q.  What's meant by that?
22    A.  Vevey is a town is Switzerland where Nestle is
23  located, its worldwide headquarters.
24    Q.  Other than what's shown in the documents that
25  have been produced, you don't have independent information

Page 45

1  regarding the outcome of the discussions that may have
2  occurred as reflected in the documents?
3    A.  No, I do not have that knowledge.
4        MR. GILLES:  We've been going for a little bit
5  over an hour.  I would propose a five-minute break.
6        (Short recess.)
7        (Deposition Exhibit 13 was marked for
8        identification.)
9        MR. GILLES:  Q.  Directing your attention to
10  Exhibit 13, would you please identify that.
11    A.  This is an e-mail from Ivan Galinovic to Robert
12  Nealis, September 10, 2003, and the subject is Dreyer's.
13    Q.  Who's Mr. Galinovic?
14    A.  I am not aware of Mr. Galinovic.
15    Q.  In the first line of the e-mail, it refers to a
16  Tahira?
17    A.  Yes.
18    Q.  Do you know who that is?  Who is that?
19    A.  Tahira Hassan.
20    Q.  What is her position?
21    A.  She works for an entity of Nestle; I'm not sure
22  which one.
23    Q.  Is she also a member of the board of Dreyer's?
24    A.  At the time of this e-mail, she was a member of
25  the board of Dreyer's.

12 (Pages 42 to 45)

Page 46

1    Q. When did she assume that position and when did
2    she leave it?
3    A. She assumed that position when the transaction
4    with Nestle closed in June of 2003. And I am not -- I
5    don't recall specifically when she left the board.
6    Q. Approximately two or three years ago?
7    A. Approximately a year after she assumed the
8    position.
9    Q. After the transaction in 2004 when Ms. Hassan
10   assumed the position, did other Nestle employees assume
11   positions on the board?
12   A. Yes. The transaction was in 2003, closed in June
13   of 2003, and at that time the board of directors was
14   comprised of ten members. Of these ten members, five of
15   those members were appointed by Nestle and confirmed by
16   the shareholders.
17   Q. And does that -- how has the composition of the
18   board changed since that point in time?
19   A. The five members that were appointed by Dreyer's
20   and confirmed by Dreyer's have not changed. The five
21   members that were appointed by Nestle have all changed.
22   Q. The composition today remains the same with five
23   Nestle appointees?
24   A. No. As of the beginning of January of 2006, when
25   Nestle acquired the remaining one-third of common stock

Page 47

1    through the exercise of the put, then the board of
2    directors became a fiduciary board of directors. So the
3    company had one shareholder only, Nestle, and the
4    composition of the board then again changed in terms of
5    the actual people on the board, particularly from Nestle,
6    and today it is a fiduciary board.
7    Q. And who are the board members today?
8    MR. ZARLENGA: I'm going to object to the form of
9    the question as beyond the scope of the deposition notice.
10   THE WITNESS: The directors from -- that were
11   appointed by Dreyer's and confirmed by the shareholders
12   and continued as fiduciary board members are Gary Rogers,
13   the CEO of Dreyer's; William F. Cronk, C-R-O-N-K, the
14   former president of Dreyer's Grand Ice Cream; John Larson,
15   an independent director; Tim Smucker, an independent
16   director; and Jan Booth, an independent director.
17   The members of the board of directors that are
18   appointed by Nestle subsequent to replace -- subsequently
19   to replace other members are currently Mr. Jim Singh,
20   S-I-N-G-H, an employee of an entity of Nestle; Mr. Paul
21   Bulcke, B-U-L-K-E [sic], who's currently the head of Zone
22   Americas for Nestle; Mr. Jean-Marie Gurnei (phonetic), I
23   believe it's G-U-R-N-E-I, who is the head of the ice cream
24   strategic business unit for Nestle; Mr. Brad Alford, I
25   believe. I don't recall the balance of the -- I'm not

Page 48

1    sure if Mr. Alford is. Mr. Joe Weller was and still may
2    be.
3    MR. GILLES: Q. Okay.
4    (Deposition Exhibit 14 was marked for
5    identification.)
6    MR. GILLES: Q. I'd like to show you what's
7    marked as Exhibit 14. Would you please identify the
8    exhibit.
9    A. This is an e-mail from John Williams to Bob
10   Birchbauer with a copy to Greg Frick and Stanley Pasarell,
11   dated April 20, 2004, and the subject is "Re price
12   increase."
13   Q. Note the exhibit is Dreyer's 2006 through
14   Dreyer's 2007, and directing your attention to the second
15   page of the exhibit --
16   A. Um-hm.
17   Q. -- is that an e-mail from Mr. Birchbauer to
18   Mr. Williams, dated April 19, 2004, subject, "Promotional
19   support charge"?
20   A. Yes, that's correct.
21   Q. And does that reflect a change in the payment
22   terms relating to Sterling's purchase of Edy's ice cream?
23   A. No. Not to the payment terms, no.
24   Q. What does it communicate?
25   A. It communicates a change in the per unit

Page 49

1    allowance arrangement between Edy's and Sterling.
2    Q. Could you explain how that worked before this
3    change?
4    A. Before the change it was $0.75 per unit, and
5    after the change it was $0.65 per unit.
6    Q. How would -- if Sterling received a bill for
7    product that it ordered, how would the allowance be shown
8    on the bill?
9    A. The allowance wouldn't be shown on the bill for
10   the products. The allowance would have been subsequently
11   shown on a credit memo or other such document.
12   Q. So Sterling would pay the face amount of the bill
13   and sometime later receive a credit based on the
14   allowance?
15   A. Sterling would pay -- they would -- no, not
16   exactly. They would deduct from the amount of the payment
17   the specific amount referenced in the credit memo.
18   Q. Directing your attention, sir, to the first page
19   of the exhibit --
20   A. Um-hm.
21   Q. -- in Mr. Williams's e-mail to Mr. Birchbauer at
22   the end of the first paragraph, it states, "However, we
23   are still way short of the goal of 90 to 95 percent ABC
24   [sic] that we agreed we would reach before increasing
25   prices."

WILLIAM COLLETTE

1    Do you see that?
2    A. Yes, I do.
3    Q. Do you know what's meant by AB -- ACV?
4    A. ACV is all commodities volume.
5    Q. What does all commodities volume mean?
6    A. All commodities volume is a measure which is
7    the -- which shows -- how can I explain this?
8        It shows what percentage of goods are being sold,
9    all goods that are being sold in a market, what percentage
10   are being sold at a particular store or particular chain
11   or particular place.
12   Q. So by -- what do you understand by 95 percent
13   ACV?
14   A. It means that products would be available at
15   retail outlets which would, on a cumulative basis, be
16   selling 90 to 95 percent of all of the total dollar volume
17   that is sold in a particular market.
18   Q. That would be the total volume for a particular
19   category like ice cream?
20   A. No. Of all products.
21   Q. All products?
22   A. All products sold in the store.
23   Q. Does Dreyer's keep track of that particular
24   measure?
25   A. Yes.

1    Q. How do you keep track of that with respect to
2    various markets?
3    A. That's a -- statistic that is reported through
4    standard market reporting, market research reporting.
5    Q. So would Dreyer's obtain that statistic from
6    ACNielsen?
7    A. At the time of this e-mail, yes; today, no.
8    Q. Who does Dreyer's get that information from
9    today?
10   A. IRI.
11   Q. With respect -- when it receives ACV information
12   from -- when it received ACV information in the past, say
13   in 2004 from ACNielsen, what markets -- I mean, how
14   localized were the markets that were the subject of the
15   statistic?
16   A. ACV volume is measured for whatever market the --
17   whoever subscribes to ACNielsen asks it to be measured
18   for, based on scanning data collected by the grocers. It
19   only covers grocery trade. It does not cover other than
20   the grocery trade where there's no scanning available.
21   Q. With respect to Puerto Rico, would it cover the
22   entire island?
23   A. It would cover only the grocery trade where
24   scanning data was available.
25   Q. Would the specific -- what would the form of

1    the -- let me start over.
2        How often would you get -- would Dreyer's receive
3    ACV reports?
4        MR. ZARLENGA: Object to the form of that
5    question is overbroad in scope.
6        THE WITNESS: When -- it was regularly available
7    from Neilsen if they asked for it.
8    MR. GILLES: Q. Do you know whether Dreyer's
9    asked for ACV reports with respect to Puerto Rico?
10   A. I do not know, do not know.
11   Q. Bob Nealis would know?
12   A. He may know.
13   Q. Who else at Dreyer's would know whether they
14   received ACV reports for Puerto Rico?
15   A. I'm not aware of anybody who would know for this
16   time.
17       (Deposition Exhibit 15 was marked for
18   identification.)
19       MR. GILLES: I would like to show you what's
20   marked as Exhibit 15 and ask if you can identify this,
21   please.
22   A. This is an e-mail from John Williams to Robert
23   Nealis with copies to Stanley Pasarell and Greg Frick,
24   dated May 24, 2004, and the subject is "Puerto Rico Law 75
25   and the U.S. Virgin Islands."

1    Q. Directing your attention to the second page of
2    the exhibit, which is -- begins on Dreyer's 500 and
3    continues through Dreyer's 502.
4        Do you see that?
5    A. Yes, I do.
6    Q. Is that a correspondence that Mr. Nealis received
7    from Mr. Williams sometime in May of 2004?
8    A. I can't -- I cannot confirm the date. There's no
9    date on the letter and it's unsigned.
10   Q. Before the break, there were some -- and I'll
11   find the particular -- well, there was one exhibit that
12   referred to a meeting in Puerto Rico involving Mr. Nealis,
13   Stanley Pasarell, and I believe it was Mr. Silva.
14       Do you remember that?
15   A. I remember there was an e-mail that was
16   discussing having a meeting.
17   Q. And you don't know whether the meeting actually
18   took place?
19   A. No, I do not.
20   Q. Were you aware in February of 2004 whether
21   employees of Payco met with Dreyer's executives concerning
22   the distribution of ice cream in Puerto Rico?
23   A. I'm not aware of a meeting. I'm only aware of
24   the contents of the communications.
25   Q. So unless it's reflected in the documents, you

WILLIAM COLLETTE

Page 54

1  don't have any additional information regarding meetings
2  that may have taken place sometime in February or March
3  of 2004 between Dreyer's executives and Payco executives?
4      A. No. I'm sorry, I don't. Only what's reflected
5  in the record.
6          (Deposition Exhibit 16 was marked for
7          identification.)
8      MR. GILLES: Q. I'd like to show you what we've
9  marked as Exhibit 16 and ask if you can identify that,
10 please.
11     A. This is a -- an e-mail from Tahira Hassan to
12 Felipe Silva, with copies to Chris Lewis, Alice Fry, Tom
13 Delaplane, and Stephen Raffe, dated June 9, 2004, with a
14 subject line which is a forward, "Ice cream exports from
15 the USA to the Caribbean region."
16     Q. Would you please review the e-mail. It's an
17 e-mail chain that's depicted on the exhibit which begins
18 with Dreyer's 2327 and continues through 2328.
19     A. Okay.
20     Q. Directing your attention to the bottom of the
21 page, there's an e-mail from Mr. Carlos Represas to Joe
22 Weller, Paul Bulcke, Tahira Hassan.
23         Do you see that?
24     A. Yes, I do.
25     Q. And Paul Bakus?

Page 55

1      A. Bulcke.
2      Q. Pardon?
3      A. Oh, Bakus, Paul Bakus.
4      Q. Who is Mr. Represas?
5      A. I believe Mr. Represas was the head of the Zone
6  Americas for Nestle at that time.
7      Q. I note in the first paragraph it says that "This
8  confirms our verbal agreement last week in New York that
9  all ice cream exports ex-Dreyer's will be managed directly
10 with the Caribbean region and not via Nestle foreign
11 trade."
12         Do you see that?
13     A. Yes, I do.
14     Q. That was a change in approach with respect to
15 distribution in the Caribbean?
16     MR. ZARLENGA: I'll object to the form of the
17 question as beyond the scope of the deposition notice.
18     THE WITNESS: In terms of how Nestle was handling
19 its distribution?
20     MR. GILLES: Q. Yes.
21     A. Yes.
22     Q. At that time Dreyer's was manufacturing Nestle
23 products, correct?
24     A. Yes. As of the time of this e-mail, yes.
25     Q. But it was being distributed through Nestle,

Page 56

1  Nestle foreign trade?
2      A. Yes. Certain of those product, yes.
3      Q. And some problems arose with respect to that
4  arrangement?
5      A. I have no information regarding problems or a
6  reason for this.
7      Q. But at this point in time or at some point in
8  time after this e-mail, which was in June 2004, Dreyer's
9  began to manage directly the shipment of Nestle product to
10 the Caribbean?
11     A. Yes.
12     Q. I would direct your attention to the top of the
13 exhibit, Mr. Collette, and specifically the last paragraph
14 on the e-mail from Ms. Hassan to Felipe Silva and others,
15 and the last sentence where it says, "Felipe and Bob, I
16 appreciate your efforts in identifying and coordinating
17 this business improvement and trust you will provide an
18 update on the actual results achieved at the end of the
19 year."
20         Do you see that?
21     A. Yes, I do.
22     Q. Do you know what efforts they were attempting to
23 coordinate?
24     A. It refers to the change of the distribution of
25 the products.

Page 57

1      Q. Wouldn't refer to efforts to coordinate
2  distribution with Sterling?
3      A. I couldn't speculate on that. I don't know.
4          (Deposition Exhibit 17 was marked for
5          identification.)
6      MR. GILLES: Q. I would like to show you what
7  we've marked as Exhibit 17 and ask would you please
8  identify this.
9      A. This was an e-mail from Greg Frick to Robert
10 Nealis, dated November 22, 2004, and the subject line is
11 "Price increase for Puerto Rico."
12     Q. And then this also includes an e-mail from John
13 Williams, dated November 17, 2004, to Bob Birchbauer and
14 Greg Frick; is that correct?
15     A. Yes. With a copy to Stanley Pasarell.
16     Q. In the first sentence of Mr. Frick's e-mail, it
17 requests Mr. Nealis to respond to John's request regarding
18 Skinny Cow.
19         Do you see that?
20     A. Yes, I do.
21     Q. What is Skinny Cow?
22     A. Skinny Cow is an ice cream novelty product.
23     Q. And is that a product that at this time Dreyer's
24 manufactured?
25     A. Yes, it is.

WILLIAM COLLETTE

Page 58

1    Q. Did it acquire it from some other manufacturer?
2    A. Dreyer's acquired the company Silhouette Brands,
3  Incorporated, and Skinny Cow is a product of Silhouette
4  Brands, Incorporated. It's a trade name.
5    Q. Did an issue develop as to who would handle this
6  product in Puerto Rico at about this time?
7    A. I'm not aware of the issue that developed, no.
8    Q. Now, I note in Mr. Williams's letter of
9  November 17, the subject line is "Price increase for
10 Puerto Rico," correct?
11   A. Yes.
12   Q. And at that time, had Mr. Williams been notified
13 of a price increase with respect to his product?
14   A. He may have. I'm not specifically sure.
15   Q. I direct your attention to the last two
16 paragraphs on the page and ask you to review that, please.
17   A. Okay.
18   Q. In a prior e-mail, there was a reference to an
19 allowance being changed.
20   A. Yes.
21   Q. And that was in the -- earlier in 2004, correct?
22   A. Yes.
23   Q. And here Mr. Williams is referring to another
24 price, $0.05 a unit price change, correct?
25   A. Yes, that's what he's referring to.

Page 59

1    Q. And do you know whether or not that price change
2  was implemented?
3    A. I believe it was.
4    Q. And --
5    A. It's a change in the allowance. It was a change
6  in the allowance.
7    Q. So it was a further reduction in the allowance?
8    A. Yes. As was the first one he referred to.
9    Q. Now, in the paragraph before the last paragraph,
10 Mr. Williams states, "As I'm sure you'll recall, Stanley
11 and I wanted to know if the price was going to be
12 increased in the U.S. What you told us was that you
13 wouldn't be increasing your list price in the U.S., but
14 the effect would be the same because you would promote
15 less."
16     Do you see that?
17   A. Oh, in this paragraph. I'm sorry, yes.
18   Q. So at the time the allowance was decreased for
19 Sterling, were there other -- there were no other price
20 changes for other distributors in the United States; is
21 that correct?
22   A. I couldn't speak to that. I don't know.
23     (Deposition Exhibit 18 was marked for
24     identification.)
25     MR. GILLES: Q. I would like to show you what's

Page 60

1  marked as Exhibit 18. Would you please identify this.
2  It's Dreyer's 2419 through Dreyer's 2421.
3    A. This is a letter on Edy's letterhead addressed to
4  Mr. John Williams at Sterling, dated November 29, 2004,
5  and it is from Mr. Bob Birchbauer with copies to Greg
6  Frick and Stanley Pasarell.
7    Q. Is this in response to the Exhibit No. 17, the
8  November 17 e-mail from Mr. Williams to Mr. Birchbauer
9  that begins "Dear Greg and Bob"?
10   A. November 17, November 29. Well, could be. He
11 doesn't specifically say in the letter that it's in
12 response to this e-mail. He just simply refers to "your
13 last letter to Greg and myself." I don't know if this is
14 the last letter to Greg and himself.
15   Q. The letter sets out information regarding the
16 price and other information about Edy's support for
17 Sterling's efforts in Puerto Rico, correct?
18   A. Yes, it does.
19   Q. And I note that in any -- at least in the initial
20 paragraph under 1999, there's a reference to the ACV,
21 50 percent ACV.
22     Do you see that?
23   A. Yes, I do.
24   Q. What do you understand when it says "Payco has
25 bought out Sterling in approximately 50 percent ACV"?

Page 61

1    A. I don't know what the term "bought out" means.
2  The term "50 percent ACV" refers to the measure that we
3  discussed earlier, as in retail outlets selling 50 percent
4  of all the volume sold in that market.
5    Q. You don't know how that measure was calculated?
6    A. The measure itself would have been calculated, as
7  we discussed earlier, through the collection of data in
8  the grocery trade, yeah.
9    Q. Are you aware of a practice of setting up
10 exclusive distribution agreements with retail outlets in
11 Puerto Rico?
12   A. Not specifically.
13   Q. So what do you -- do you have an -- did
14 Mr. -- strike that.
15     Has it come to your attention that Payco on
16 occasion has had an agreement with a retail chain in
17 Puerto Rico that would limit the chain from acquiring
18 product from other distributors?
19   A. There are references in the record to Payco
20 having agreements with retailers over that period. I'm
21 aware of those.
22   Q. But beyond that, you have no
23 independent information?
24   A. No, I have no independent knowledge of that, no.
25   Q. And you -- who at Dreyer's would have information

WILLIAM COLLETTE

Page 62

1  concerning that matter?
2      A.  No one at Dreyer's that I'm aware of today would
3  have that information.  Mr. Nealis would perhaps know.
4      Q.  Do you know whose file this particular exhibit
5  came from, these documents came from?
6      A.  Not specifically, no.
7      Q.  Who was responsible for gathering documents
8  together to respond to the subpoena?
9      A.  The documents were gathered by the office of the
10  assistant general counsel at Dreyer's.
11      Q.  What's his name?
12      A.  Her name.
13      Q.  Her name?
14      A.  Heidi Zuber, Z-U-B-E-R.  She's the associate
15  general counsel.
16      (Deposition Exhibit 19 was marked for
17      identification.)
18      MR. GILLES:  Q.  I'm showing you what's been
19  marked as Exhibit 19, which bears Dreyer's 40 through 41.
20  Would you identify this, please.
21      A.  This is an e-mail chain, the last of which is an
22  e-mail from Stan Krause to Robert Nealis, Charles
23  Woodward, Bob Birchbauer, dated May 27, 2005, subject
24  Denny's.
25      Q.  Who is Stan Krause?

Page 63

1      A.  Stan Krause is a -- an employee of the
2  food-service division of Dreyer's.
3      Q.  How long has he worked at Dreyer's?
4      A.  I don't have that information.
5      Q.  Where is he -- where does he report to?
6      A.  He reports in the food-service group itself.
7  There's a specific group.
8      Q.  Are they located in Oakland?
9      A.  Yes, they are.
10      Q.  And his office would be in Oakland?
11      A.  No.  His office would be, I believe, in Florida.
12      Q.  And what are his general responsibilities?
13      A.  Sale of food-service products.
14      Q.  How do you distinguish food-service product from
15  Edy's ice cream that you buy in the grocery store?
16      A.  Products that are sold typically in bulk to
17  restaurants, to food-service outlets, schools, things of
18  that nature, where the product is served as opposed to
19  purchased for -- is served for consumption on-premises.
20      Q.  Is it primarily in 3-gallon containers?
21      A.  That's primary business, yes.
22      Q.  Are there -- is it -- is there a particular brand
23  associated with the food-service product?
24      A.  There are a number of brands, Edy's, Haagen-Dazs.
25      Q.  So there are counterparts to the --

Page 64

1      A.  Yes, they're complements of retail consumer
2  brands.
3      Q.  Now, I would direct your attention to the bottom
4  of the -- well, to the second page of the exhibit, and --
5  which is an e-mail from Stan Krause to Charles Woodward,
6  Robert Nealis, and Bob Birchbauer, dated May 27, 2005.
7      Who is Charles Woodward?
8      A.  He works in the food-service group, Dreyer's
9  Grand Ice Cream, in Oakland.
10      Q.  And would you please review the e-mail.
11      A.  Okay.
12      Q.  The second to last sentence there says, "Is there
13  any way that we can enforce a walk-in, walk-out policy
14  with Pico," P-I-C-O, "we are hurting ourselves?"
15      Do you see that?
16      A.  Yes, I do.
17      Q.  Do you know what he's referring to by "a walk-in,
18  walk-out policy with Pico"?
19      A.  I don't know what that term is.  I have no direct
20  knowledge of that.
21      Q.  Prior in the e-mail, it stated that he was just
22  informed from Sterling that Edy's lost Denny's business
23  for Payco on tubs, right?
24      A.  Yes.
25      Q.  I take it that means that Sterling had been

Page 65

1  supplying Denny's prior to this date and now it would in
2  the future be supplied by Payco.
3      MR. ZARLENGA:  You're saying Payco, but this says
4  P-I-C-O.  I'm not sure one is equivalent to the other, so
5  I'm going to object to that as a possible
6  mischaracterization.
7      MR. GILLES:  I did note when I read the sentence
8  what the spelling was.
9      THE WITNESS:  As to the substance, it's not clear
10  what they're supplying Denny's with.
11      MR. GILLES:  Q.  Directing your attention, then,
12  to the first page of the exhibit, which is Mr. Nealis and
13  Mr. Nealis' e-mail of May 27, 2005, to Stan Krause,
14  Charles Woodward, and Bob Birchbauer, dated, as I
15  mentioned, May 27, 2005.
16      Do you see that?
17      A.  Yes, I do.
18      Q.  And about halfway through the e-mail, it states,
19  "We cannot be in a position of approaching them" --
20      I think Mr. Nealis's e-mail uses the term Payco,
21  spelled P-A-Y-C-O.  Is that correct?
22      A.  Yes, that's correct.
23      Q.  And again continuing in the e-mail, he states,
24  "We cannot be in a position of approaching them for any
25  sort of cooperative market treatment of customers.  If you

WILLIAM COLLETTE

Page 66

1  need more information, perhaps we should discuss by
2  phone."
3      Do you see that?
4      A. Yes.
5      Q. Do you know whether there was a consideration to
6  have cooperative market treatment of customers between
7  Payco and Sterling?
8      A. No. Not from -- no, I don't know. I couldn't
9  read that out of what you just read or what you just asked
10  me to read there.
11      Q. And independent of this, you don't have any
12  information regarding cooperative treatment of Payco and
13  Sterling?
14      A. Let me make sure I understand your question.
15      Q. Let me restate it.
16      A. Okay.
17      Q. Beyond what's set out in this e-mail, you don't
18  have any information regarding cooperative market
19  treatment between Payco and Sterling?
20      A. Between Payco and Sterling, no.
21      Q. Directing your attention to the next e-mail where
22  it's Mr. Krause, dated -- from Mr. Krause, dated May 27,
23  2005, to Mr. Nealis, Charles Woodward, and Mr. Birchbauer.
24      A. Um-hm.
25      Q. In this e-mail, he explains or he states,

Page 67

1  "Walk-in, walk-out simply means if Sterling or Payco see
2  our products in a location they leave it alone."
3      Are you aware of any policy like that that
4  Dreyer's would have in place with respect to other
5  products?
6      A. Dreyer's doesn't have any policy like that.
7      Q. Just to complete, going up the next e-mail,
8  Mr. Nealis, dated May 27, 2005, to Stan Krause, Charles
9  Woodward, Bob Birchbauer, says, "Thanks for the
10  explanation. But just to be clear, Payco" -- P-A-Y-C-O --
11  "is a competitor and they are not selling Edy's. Why
12  would we agree to walk from an Edy's account more" -- "Why
13  would they agree to walk away from an Edy's account any
14  more than Sterling would not try to take away any Payco
15  account?"
16      And then the next e-mail from Mr. Krause to
17  Mr. Nealis with a copy to Charles Woodward and Bob
18  Birchbauer, subject Denny's, his response is, "Because we
19  are all partners supporting Nestle."
20      Right?
21      A. Well, what do you mean by "right"?
22      Q. That's what the e-mail says.
23      A. That's what Stan Krause's e-mail says.
24      Q. Right.
25      A. But that contradicts what Mr. Nealis said in his

Page 68

1  prior e-mail.
2      Q. Apart from the e-mail, do you have any
3  information at all about Dreyer's position on what
4  Mr. Krause refers to as a walk-in, walk-out policy?
5      A. Not specifically on a walk-in, walk-out policy.
6      What Mr. Nealis states here is that Payco and
7  Sterling are competitors and therefore Dreyer's would
8  compete with -- would compete with them on an arm's-length
9  basis in that circumstance.
10      (Deposition Exhibit 20 was marked for
11      identification.)
12      MR. GILLES: Q. Is Mr. Krause still employed by
13  Dreyer's?
14      A. I'm not aware of that. I don't know.
15      Q. I'd like to show you what we've marked as
16  Exhibit 20 and ask you to identify that, please.
17      A. This is an e-mail from Stan Krause to John
18  Williams and Robert Nealis with copies to Bob Birchbauer
19  and Charles Woodward, dated April 7, 2005, regarding price
20  increases.
21      Q. And below that is an e-mail from John Williams to
22  Mr. Birchbauer, Stan Krause, and Robert Nealis, dated
23  April 7, 2005, subject "Price increases"; is that correct?
24      A. Yes.
25      Q. And referring to Mr. Krause's e-mail of April 7,

Page 69

1  2005, the first sentence reads, "Bob N, can we do anything
2  to back off Payco" -- P-A-Y-C-O -- slash, "Nestle? We've
3  backed off many opportunities with SYSCO because of the
4  international rules here. Please help. Stan."
5      Do you see that?
6      A. Yes, I do.
7      Q. Who is SYSCO, S-Y-S-C-O, or what is SYSCO?
8      A. SYSCO is a large food-service distributor.
9      Q. And do they compete with Dreyer's?
10      A. SYSCO distributes products in certain markets for
11  Dreyer's, and certain markets they would compete with
12  them. They would be distributing products of other
13  manufacturers.
14      Q. Do you know what Mr. Krause means when he refers
15  to international rules here?
16      A. I do not.
17      Q. The sentence reads, "We backed off many
18  opportunities with SYSCO because of international rules
19  here. Please help."
20      Who would you ask at Dreyer's to get more
21  information about this statement?
22      A. I don't know who I would ask about that specific
23  statement.
24      Q. It seems to me that Mr. Krause is saying they
25  have an arrangement with SYSCO that Dreyer's is not

WILLIAM COLLETTE

Page 70

1  competing with SYSCO.
2  · MR. ZARLENGA: Let me object to that question as
3  argumentative, lacking foundation, and going beyond the
4  scope of the deposition notice.
5  THE WITNESS: I can't infer that from the word
6  "opportunities."
7  MR. GILLES: Q. What do you understand by it?
8  A. I don't actually understand what he's referring
9  to. It doesn't make sense to me.
10  (Deposition Exhibit 21 was marked for
11  identification.)
12  MR. GILLES: Q. Showing you what's been marked
13  as Exhibit 21, which bears Dreyer's numbers 2025 through
14  2030, and ask you to identify that, please.
15  A. This is an e-mail from Karen O'Keefe to Bob
16  Birchbauer and Robert Nealis with copies to Kerri Ortiz
17  and Sally Graham, dated June 27, 2005, and the subject
18  matter is "Sterling -- Dibs pricing."
19  Q. What is Dibs?
20  A. Dibs is a novelty product manufactured by
21  Dreyer's Grand Ice Cream, which are bite-sized ice
22  cream -- coated ice cream pieces.
23  Q. And it's relative recent, new product?
24  A. Yes. Within -- well, recent, two years.
25  Q. So at this time, before this time, Sterling had

Page 71

1  not -- strike that.
2  In June of 2005, the date of the e-mail, is that
3  about the time that the product was being introduced?
4  A. Roughly. I'm not totally sure of that time
5  frame.
6  Q. The e-mail chain here reflects how the price to
7  Sterling was arrived at, does it not?
8  A. Give me a moment.
9  Q. Please.
10  A. Let me take a scan here.
11  Yes, this is a derivation of the distributor
12  price point.
13  Q. In the e-mail at the top of the page where it
14  says there would be a $0.12 -- would be -- it arrives at a
15  $0.12 figure. What does that represent?
16  A. It represents the reduction in the price to
17  Sterling that is attributed to the freight cost of the
18  product being shipped to Puerto Rico, and the price is
19  being reduced because Sterling bears the freight cost
20  itself. So they're equivalizing the price to the national
21  distributor price where Dreyer's pays the freight of
22  $1.99, $0.12 higher.
23  Q. Directing your attention to the next page of the
24  exhibit --
25  A. Um-hm.

Page 72

1  Q. -- would you please identify that?
2  A. This is a -- entitled "Subdistributor Report,
3  Year-to-Date 2005, Total Merchandising Units." It's an
4  Excel spreadsheet, dated April 8, 2005.
5  Q. Does this reflect total sales as opposed to any
6  particular distributor?
7  A. I'm not sure. It refers to merchant
8  distributors, in the plural, in the first column heading.
9  Q. Well, let's see -- do you see on the -- on
10  Page 2029 on the top left column, "Houston," and then it
11  has "Sterling Merchandising."
12  Do you see that?
13  A. Yes.
14  Q. So Sterling acquires its product from a facility
15  in -- a Dreyer's facility in Houston?
16  A. Houston manufacturing facility for Dreyer's, yes.
17  Q. Is that the same location that Payco would
18  acquire its product from?
19  A. You have to be more specific about that.
20  Q. In terms of particular product line or --
21  A. Some products. Other products would be
22  manufactured in other Dreyer's locations.
23  (Deposition Exhibit 22 was marked for
24  identification.)
25  MR. GILLES: Q. I'd like to show you what's

Page 73

1  marked as Exhibit 22, which consists of Dreyer's 1057
2  through Dreyer's 1059. Would you identify that, please.
3  A. This is an e-mail from Robert Nealis to Tom
4  Delaplane, dated Wednesday, August 24, 2005 with a subject
5  line "Visit."
6  Q. And directing your attention down the page, there
7  appears to be an e-mail from Valerie Cornut, C-O-R-N-U-T,
8  dated August 24, 2005, to Robert Nealis, subject "Visit."
9  Do you see that?
10  A. Yes, I do.
11  Q. Do you know whether Ms. Cornut came to visit
12  Dreyer's during September of 2005?
13  A. No, I do not know.
14  Q. Do you know who she -- have you met her?
15  A. No. I do not know who she is.
16  Q. I note in that -- in the -- in Ms. Cornut's
17  e-mail to Mr. Nealis, of August 24, 2005, the last
18  sentence of that references, "I will be flying to the
19  steering committee from SFO on Monday the 26th."
20  Do you see that?
21  A. Um-hm.
22  Q. What is the steering committee?
23  A. I have no idea.
24  (Deposition Exhibit 23 was marked for
25  identification.)

WILLIAM COLLETTE

Page 74

1    MR. GILLES:  Q.  Showing you what's been marked
2  as Exhibit 23, would you please identify that.
3    A.  This is an e-mail from Christine Hart to Robert
4  Nealis with a copy to David Markley, M-A-R-K-L-E-Y,
5  January 24, 2006, subject line, "Sterling Merchandise."
6    Q.  Who is Christine Hart?
7    A.  Christine Hart works in the southeast division of
8  Dreyer's Grand Ice Cream.
9    Q.  David Markley?
10    A.  David Markley no longer works for Dreyer's.  He
11  worked in the same division.
12    Q.  Directing your attention to the second page of
13  the exhibit, the exhibit bears -- it consists of Dreyer's
14  1781 through Dreyer's 1785.
15      Would you identify what appears at Page 1782, the
16  second page of the exhibit.
17    A.  The second page.  Oh, this, you can't see the
18  numbers on the bottom of this one.
19    Q.  Oh.
20    A.  This is -- it appears to be a price table for
21  Sterling Merchandising with some text above the beginning
22  of the history, the price history.  It starts in 2000.
23    Q.  Did Christine Hart have access to Sterling's
24  purchase records to be able to compile information
25  regarding that?

Page 75

1    A.  Yes, she would have, yes.
2    Q.  Do you have a sense of what the purpose of -- why
3  Mr. Nealis sought this information?
4    A.  He was in charge of the business.
5    Q.  Who is Lee Partin?
6    A.  Lee Partin is the general manager in the eastern
7  division of Dreyer's Grand Ice Cream.
8    (Deposition Exhibit 24 was marked for
9    identification.)
10    MR. GILLES:  Q.  I'm showing you what's marked as
11  Exhibit 24.  Would you please identify that.  The exhibit
12  has Bates No. Dreyer's 762 and 763.
13    A.  This is headed by an e-mail from Robert Nealis to
14  Stanley Pasarell, dated March 6, 2006, and the subject
15  line is "Palm 7:00 p.m. -- 3.21."
16    Q.  And referring to the second page of the exhibit,
17  Dreyer's 763 is an e-mail chain.  Begins with an e-mail
18  from Robert Nealis to Mr. John Williams with a carbon copy
19  to Lee Partin and a copy to Stanley Pasarell, regarding a
20  visit to Puerto Rico; is that correct?
21    A.  Yes.
22    Q.  Had Lee Partin taken Mr. Birchbauer's place at
23  that time?
24    A.  I don't know specifically.
25    Q.  Do you know whether the meeting took place?

Page 76

1    A.  I don't know whether the meeting took place.
2    (Deposition Exhibit 25 was marked for
3    identification.)
4    MR. GILLES:  Q.  I would like to show you what's
5  marked as Exhibit 25.  It bears Dreyer's No. 633 and 634,
6  and would you please identify that.
7    A.  Yes.  This is an e-mail chain headed by an e-mail
8  from Paul Giomi, G-I-O-M-I, to Robert Nealis, on March 10,
9  2006.  And the subject line is "Wal-Mart group/Dreyer's
10  organization."
11    Q.  And this again is an e-mail chain.  And directing
12  your attention to the second page of the exhibit, the
13  first message is one from Jose Flores to Paul Giomi, dated
14  February 28, 2006, of the same subject.
15      Do you see that?
16    A.  Yes.
17    Q.  Who is Jose Flores?
18    A.  Jose Flores is an employee of Payco Foods.
19    Q.  Do you know his position at Payco?
20    A.  I do not.
21    Q.  I note that there are two numbered items on the
22  e-mail, and the second item is a Dreyer's organizational
23  chart.  Do you see that?
24    A.  Yes, I do.
25    Q.  Does Dreyer's have an organizational chart?

Page 77

1    A.  Yes, it does.
2    Q.  Then directing your attention to the first page
3  of the exhibit --
4    A.  Um-hm.
5    Q.  -- there's another e-mail from Mr. Flores to
6  Paul -- to Mr. Giomi, dated March 6, 2006.  Do you see
7  that?
8    A.  Yes.
9    Q.  That's just -- it appears to be a follow-up, does
10  it not?
11    A.  Take a second.  Just a continuing discussion,
12  yeah.
13    Q.  Directing your attention to Mr. Giomi's, the
14  first -- or the e-mail that is the most recent in time,
15  Mr. Giomi's e-mail to Mr. Nealis, of March 10, 2006 --
16    A.  Yes.
17    Q.  -- it states, "I'm going to ignore this request."
18    A.  Yes.
19    Q.  Do you see that?
20    A.  Yes, I do.
21    Q.  Why would Mr. Giomi ignore the request?
22    A.  I don't know.  I'm not aware.
23    Q.  Are you aware of any reason why Dreyer's would
24  not give Payco an organization chart?
25    A.  I'm not aware of why they would request it nor

WILLIAM COLLETTE

Page 78

1 why we would respond that way.
2         (Deposition Exhibit 26 was marked for
3         identification.)
4     MR. GILLES:  Q.  Showing you what's been marked
5 as Exhibit 26, would you please identify that.
6     A.  This is an e-mail from Lee Partin to Robert
7 Nealis, dated March 16, 2006, subject, "Sterling 2005
8 sales.xls."
9     Q.  And this exhibit is Dreyer's Exhibit 448
10 through 451.
11        Directing your attention then to the second page
12 of the exhibit, Dreyer's 449, would you identify that,
13 please.
14     A.  This appears to be a spreadsheet showing sales of
15 products to Sterling Merchandising in 2004 and 2005, by
16 product.
17     Q.  And the far right-hand column shows sales
18 increase over prior year; is that correct?
19     A.  That's correct.
20     Q.  And it provides the information both in dollars
21 and units; is that correct?
22     A.  That's correct.
23     Q.  Directing your attention to the last page of the
24 exhibit --
25     A.  Um-hm.

Page 79

1     Q.  -- there appear to be, in the left -- in the
2 left-hand column it's entitled "Master Group Name."
3         Do you see that?
4     A.  Yes, I do.
5     Q.  Those are Dreyer's products that it sells to
6 Sterling?
7     A.  Yes.  And they're Dreyer's products, some of
8 which it appears they sell to Sterling.
9     Q.  And under the -- in the first column under
10 "Current Pricing Per CU," there's a column for Sterling.
11 Do you see that?
12     A.  Yes, I do.
13     Q.  And the next column is "Southeast Distributor."
14        Do you see that?
15     A.  Yes.
16     Q.  What's referenced under the "Southeast
17 Distributor" column?
18     A.  Prices to the distributor whose name is Southeast
19 Distributor.
20     Q.  Is that an independent distributor?
21     A.  Yes.
22     Q.  Not a -- the first exhibit we looked at some time
23 ago had company distribution channels.
24     A.  Correct.
25     Q.  But the Southeast Distributor, that's a

Page 80

1 counterpart -- is a comparable position to Sterling?
2     A.  It's an independent distributor.
3     Q.  Okay.  And is -- under the right-hand column
4 where it says "Allowances Per Unit" --
5     A.  Yes.
6     Q.  -- do you know what's shown there?
7     A.  Well, the dollar figures.
8     Q.  And --
9     A.  It appears to be promotional allowance per unit.
10     Q.  Did Sterling and the Southeast Distributor
11 receive the same allowance per unit?
12     A.  I don't know that.
13     Q.  Do you know what accounts for the difference in
14 price between -- let's just take the first item on the
15 list.  Sterling has 2.36 and Southeast Distributor has
16 2.64.
17     A.  Sterling pays its own freight.
18     Q.  The Southeast Distributor does not?
19     A.  Probably doesn't.
20         (Deposition Exhibit 27 was marked for
21         identification.)
22     MR. GILLES:  Q.  Showing you what's been marked
23 as Exhibit 27, would you please identify that.
24     A.  This is an e-mail chain, headed by an e-mail from
25 Robert Nealis to John Williams with copies to Stanley

Page 81

1 Pasarell and Lee Partin.  The date is March 28, 2006, and
2 the subject is SlowChurned.
3     Q.  And the exhibit has Dreyer's 908 and 909; is that
4 correct?
5     A.  Yes.
6     Q.  Directing your attention to the e-mail that's on
7 the lower part of the page from Mr. Williams to
8 Mr. Partin, dated March 23, 2006, with copies to
9 Mr. Nealis and Mr. Pasarell, I note in the first -- in the
10 first sentence, Mr. Williams states that he's "looking
11 forward to taking Edy's to its rightful market share
12 (50 percent plus or minus)."
13         Do you have a sense of what Edy's -- what would
14 be -- a rightful market share would be in Puerto Rico?
15     MR. ZARLENGA:  Object to the form of the question
16 as beyond the scope of the deposition notice and calling
17 for speculation.
18     THE WITNESS:  I don't know what the term
19 "rightful market share" means.
20     MR. GILLES:  Q.  Well, do you know whether
21 Mr. Partin and Mr. Williams discussed a goal, a
22 market-share goal for Edy's ice cream in Puerto Rico?
23     A.  I have no direct knowledge of that, no.
24     Q.  In the second sentence, he talks -- Mr. Williams
25 states, "Our biggest opportunity to gain distribution" --

WILLIAM COLLETTE

Page 82

1  "is to gain distribution where Nestle is presently paying
2  to keep us out."
3      Do you see that?
4      A. Yes, I do.
5      Q. And do you have any information about the extent
6  of the market that's foreclosed from Sterling?
7      MR. ZARLENGA: Object to the form of the
8  question, utterly lacking in foundation, calls for
9  speculation, beyond the scope of the deposition notice.
10      THE WITNESS: I don't know what he's referring
11  to.
12      (Deposition Exhibit 28 was marked for
13      identification.)
14      MR. GILLES: Q. Showing you what's been marked
15  as Exhibit 28, which consists of Dreyer's 1608 through
16  Dreyer's 1610, would you please identify it.
17      A. Yes. This is an e-mail chain headed by an e-mail
18  from Paul Giomi to Sally Graham, dated September 5, 2006,
19  subject PR.
20      Q. Who is it Sally Graham?
21      A. Sally Graham worked for Dreyer's in the
22  international sales division and she's located in Florida.
23      Q. Would you please review the e-mails that are in
24  the exhibit.
25      A. Okay.

Page 83

1      Q. In September 2006, did Dreyer's distribute --
2  manufacture and distribute Starbucks ice cream?
3      A. Yes.
4      Q. And was Sterling authorized to purchase Starbucks
5  ice cream during that time period?
6      A. Not specifically.
7      Q. Why was that?
8      A. Because there's a question of whether or not
9  Dreyer's could sell Starbucks into that market
10  irrespective of who their distributor was.
11      Q. What was the basis for the question?
12      A. The agreement between Dreyer's and Starbucks for
13  the joint venture that actually owns the Starbucks ice
14  cream business.
15      Q. The agreement between Starbucks and Dreyer's
16  limited Dreyer's authority to distribute the brand --
17      A. Yes.
18      Q. -- to certain geographic areas?
19      A. Correct.
20      Q. And you're uncertain as to whether or not it
21  permitted Dreyer's to distribute it to Puerto Rico?
22      A. That was the question at issue.
23      Q. Do you know if that was resolved?
24      A. I don't recall.
25      Q. Does Dreyer's still distribute Starbucks?

Page 84

1      A. Yes.
2      (Deposition Exhibit 29 was marked for
3      identification.)
4      MR. GILLES: Q. Showing you what's been marked
5  as Exhibit 29, would you please -- which consists of
6  Dreyer's 757 through 758, would you please identify that.
7      A. Yes. It's an e-mail chain from Paul Giomi to
8  Shawn Bovee, and the date is October 6, 2006. There are
9  copies to Frank Higgins, Daniel Aellen, A-E-L-L-E-N, both
10  of whom are in the Glendale foreign trade office of
11  Nestle, as is Mr. Bovee. Also to Daniel Kolhoff,
12  K-O-L-H-O-F-F, also in the Glendale foreign trade, and to
13  Sally Graham. The subject is "Ice cream exports."
14      Q. And directing your attention to the lower part of
15  the page, that is an e-mail from Shawn Bovee to Paul
16  Giomi, dated October 6, 2006; is that correct?
17      A. That's correct.
18      Q. And at the time of the e-mail in 2006, was
19  Dreyer's handling -- to what extent was Dreyer's handling
20  export of Nestle product?
21      A. I don't understand your question.
22      Q. Well, I'll approach it this way.
23      Directing your attention to the e-mail, on the
24  lower part of the page, the second sentence states, "As
25  mentioned, the ice cream export business managed by

Page 85

1  Foreign Trade has become increasingly difficult since we
2  went live with different segments of GLOBE over the past
3  several months."
4      Do you see that?
5      A. Um-hm.
6      Q. And there is -- then the e-mail sets forth
7  additional information concerning the customer base of --
8  is that of the foreign -- that's being managed by foreign
9  trade?
10      A. At that time.
11      Q. At some point in time, did -- was this
12  responsibility for this assumed by Dreyer's?
13      A. Portions of it, yes.
14      Q. What portions?
15      A. I know specifically that Puerto Rico was assumed
16  by Dreyer's.
17      Q. And when did that take place?
18      A. Well, subsequent to this October date,
19  October 2006 date when the foreign trade office was going
20  live with GLOBE.
21      Q. So what is the current responsibility that
22  Dreyer's has with respect to Puerto Rico and the foreign
23  trade office of Nestle? Is there any duplication between
24  the two?
25      A. Dreyer's sells Nestle products that it

WILLIAM COLLETTE

Page 86

1  manufactures -- Nestle products manufactured by Dreyer's
2  to Payco, and Dreyer's sells certain Dreyer's products
3  that are manufactured by Dreyer's to Sterling.
4      Q.  And if Nestle manufactures products someplace
5  else and sells those to Payco, that isn't managed by
6  Dreyer's?
7      A.  Well, that would be correct.  But that -- there
8  are no products manufactured elsewhere that are sold into
9  Payco in ice cream distribution.
10      (Deposition Exhibit 30 was marked for
11      identification.)
12      MR. GILLES:  Q.  Showing you what's been marked
13  as Exhibit 30, Mr. Collette, which consists of Dreyer's
14  930 through 932, would you please identify that.
15      A.  An e-mail chain, the last of which is an e-mail
16  from Paul Giomi to Daniel Kolhoff, K-O-L-H-O-F-F, Glendale
17  emerging markets division, dated December 21, 2006,
18  subject, "Turtle Mountain information to Payco Foods."
19      Q.  Would you please review the exhibit.
20      What is Turtle Mountain?
21      A.  It's an ice cream product.
22      Q.  Who is it manufactured by?
23      A.  I'm not specifically sure.
24      Q.  Is it manufactured by Dreyer's?
25      A.  No, it is not manufactured by Dreyer's.

Page 87

1      Q.  Does Dreyer's distribute the product?
2      A.  Yes.
3      Q.  Where does Dreyer's distribute the product?
4      A.  Very limited.  I'm not sure which markets.
5      Q.  I note on the second page of the exhibit,
6  Dreyer's 931, in the e-mail from Paul Giomi, December 21,
7  2006, to a number of people, principally Alejandra
8  Pacheco, the e-mail states, "Alejandra, we cannot sell
9  this product to Payco at this time.  Thank you, Paul."
10      Do you see that?
11      A.  Yes, I do.
12      Q.  Do you have an understanding why Dreyer's cannot
13  sell the product to Payco at that time?
14      A.  No.  The later e-mail infers that they were
15  selling it to Sterling.
16      Q.  Well, in directing your attention, then, to an
17  e-mail on the first page of the exhibit, Dreyer's 930,
18  specifically the one about two-thirds down the page, from
19  Paul Giomi, dated December 21, 2006, to Daniel Kolhoff,
20  subject "Turtle Mountain information to Payco Foods," he
21  says, "We distribute in the U.S.  If we were to begin
22  selling in Puerto Rico, it would have to go through
23  Sterling Merchandising.  Paul."
24      Do you see that?
25      A.  Yes.

Page 88

1      Q.  Do you know whether as of December 2006 Dreyer's
2  was selling, distributing Turtle Mountain to Sterling?
3      A.  No.
4      MR. ZARLENGA:  I'll object to the scope.  I'm
5  going to object to the question as beyond the scope of the
6  deposition notice.
7      You can answer the question, sir.
8      THE WITNESS:  I'm not aware.
9      (Deposition Exhibit 31 was marked for
10      identification.)
11      MR. GILLES:  Q.  Showing you what's been marked
12  as Exhibit 31, which has Dreyer's No. 977, would you
13  identify that, please.
14      A.  This is an e-mail from Paul Giomi to Jill
15  Shoemaker with a copy to Buttons Coleman --
16      Q.  Who is Jill Shoemaker?
17      A.  Jill Shoemaker works for the ice cream SBU group
18  in an entity of Nestle located in Vevey.
19      Q.  What does SBU mean?
20      A.  Excuse me.  Strategic business unit.
21      -- dated June 5, 2007.
22      Q.  And who is Buttons Coleman?
23      A.  Buttons Coleman is a vice president of
24  manufacturing who works for Dreyer's Grand Ice Cream.
25      Q.  Would you please review the e-mail.

Page 89

1      A.  Um-hm.
2      Q.  The e-mail concerns pricing updates for Puerto
3  Rico in the Caribbean?
4      A.  Um-hm.
5      Q.  And it's an e-mail -- at the time of the e-mail,
6  Mr. Giomi was head of international sales for Dreyer's?
7      A.  No, not head of international sales.  He worked
8  in the international sales group for Mr. Coleman.
9      Q.  Did pricing updates and changes with respect to
10  Puerto Rico and the Caribbean have to be reviewed by
11  Nestle in Vevey?
12      MR. ZARLENGA:  I'm going to object to that
13  question as overbroad.
14      THE WITNESS:  The -- this deals with two separate
15  subjects.  One is general pricing in Puerto Rico.  More
16  specifically, this deals with the sale of pint ice cream
17  in the Caribbean, which is different.  The pricing would
18  be reviewed at this time -- this is when Dreyer's is
19  owned -- no longer owned 66 percent by Nestle.  This is
20  when Dreyer's is owned 100 percent, and so the pricing is
21  a -- is a discussion that they would have, sure, no matter
22  who the distributor is.
23      (Deposition Exhibit 32 was marked for
24      identification.)
25      MR. GILLES:  Q.  Showing you what's been marked

WILLIAM COLLETTE

Page 90

1  as Exhibit 32, sir, which has Dreyer's No. 698. Would you
2  identify that.
3      A. E-mail from Paul Giomi to Ronda Maples, copies to
4  Sally Graham, Sharon Reece, Terri George, dated Monday,
5  June 11, 2007, subject, "Pricing Payco foods."
6      Q. Who is Ronda Maples?
7      A. Ronda Maples is an employee of Dreyer's Grand Ice
8  Cream.
9      Q. What is her position?
10     A. She works in the controllers group in Oakland.
11     Q. Sharon Reece. Who is she?
12     A. Reece, I believe, works in the controllers group
13  as well.
14     Q. And Terri George?
15     A. Same.
16     Q. Then directing your attention to the lower
17  e-mail, which is from Paul Giomi to Terri George, subject,
18  "Pricing Payco foods," would you please review that.
19     A. Yes.
20     Q. Then the first sentence, Mr. Giomi states, "I
21  need to roll back" -- "I need to roll back to previous
22  pricing for Payco Foods in Puerto Rico."
23         Do you see that?
24     A. Yes, I do.
25     Q. Do you have an understanding of why pricing had

Page 91

1  to be rolled back for Payco at -- in June of 2007?
2      A. Oh, yes, I do.
3      Q. Would you explain that, please?
4      A. Because the way that pricing changes are made in
5  the markets within Nestle is on an annual basis, and so
6  the way that pricing is implemented is on an annual basis.
7  This is the mid-year, so this is the correction of a
8  pricing change that was entered improperly. It's
9  administrative.
10     Q. So sometime before June 11, 2007, a pricing
11  change had been implemented by Dreyer's for Payco; is that
12  right?
13     A. For products sold to Payco. And that pricing
14  change subsequently implemented when -- in the appropriate
15  cycle.
16     Q. Do you know how far -- when in time before
17  June 11, 2007, the price change was implemented?
18     A. I'm not aware of that specifically, no.
19         (Deposition Exhibit 33 was marked for
20         identification.)
21     MR. GILLES: Q. Showing you what's been marked
22  as Exhibit 33, would you -- which bears Dreyer's No. 836
23  through 839, would you identify that, please.
24     A. This is an e-mail from Paul Giomi to Terri
25  George, Ronda Maples, copies Sally Graham and Sharon

Page 92

1  Reece, dated July 11, 2007, subject, "Pricing Payco
2  foods."
3      Q. And who is Terri George?
4      A. Again, I believe she work in the controllers
5  group.
6      Q. And this again relates to the matter that we
7  discussed with respect to Exhibit 32 on rolling back the
8  price for Payco?
9      A. Yes. It is administrative.
10     Q. That's the same -- it's the same situation?
11     A. Yes.
12     Q. I note in the third sentence in the initial, the
13  e-mail that appears on the top of the page, the one from
14  Mr. Giomi to Terri George and others, it says, "I know
15  Ronda updated the pricing which actually rolled back the
16  pricing due to a request from Vevey. However, the higher
17  pricing is showing up when we invoice them."
18         Do you see that?
19     A. Yes.
20     Q. Does that mean the attempt to correct it wasn't
21  successful initially and so the invoicing continued at the
22  previous price?
23     A. That's what it would appear, yes.
24     Q. Now, at this point in time, Dreyer's was dealing
25  directly with Payco, correct?

Page 93

1      A. Correct.
2      Q. Yet the e-mail refers to a request from Vevey.
3  Do you see that?
4      A. Um-hm.
5      Q. Do you have a -- why would the request come from
6  Vevey as -- why would the request come from Vevey?
7      A. Because the ice cream SBU, strategic business
8  unit, is located in Vevey.
9      Q. So since this was a -- I understood this to be an
10  administrative error with respect to increasing the price
11  for Payco.
12     A. Right.
13     Q. Why wasn't that just something that was addressed
14  between Payco and Dreyer's directly?
15     A. Because Payco is like Dreyer's, an entity owned
16  by Nestle, and so the ice cream SBU has awareness of those
17  two entities in those markets different than Sterling.
18  Sterling is an entity that distributes products for
19  Dreyer's. Sterling doesn't have an association with the
20  ice cream SBU. Sterling has an association with Dreyer's,
21  so those two things would happen differently.
22         (Deposition Exhibit 34 was marked for
23         identification.)
24     MR. GILLES: Q. Showing you what's been marked
25  as Exhibit 34, Mr. Collette, which consists of Dreyer's

WILLIAM COLLETTE

Page 94

1  317 and 318, and I would ask if you would identify that,
2  please.
3      A. The page is titled "Payco Pricing Worksheet." It
4  appears to be a series of columns with products and sales
5  history for 2006 and '7 in dollars and units.
6      Q. Do you know whether this is a complete listing of
7  sales by dollars and units for Payco for the time periods
8  reflected?
9      A. I do not know that.
10     Q. Do you know who caused this document to be
11 printed or prepared?
12     A. No, I do not.
13     Q. Under the column on the right-hand side where it
14 says "2006 price brand calculation," do you see that?
15     A. Yes, I do.
16     Q. What is depicted there?
17     A. It's the unit price of the item.
18     Q. In dollars?
19     A. Yes.
20     Q. And that's the price that Payco would pay for the
21 item?
22     A. I'm not sure about that.
23     Q. Why aren't you sure?
24     A. Because I'm just simply doing the math here. The
25 price in the column you're referring to times the units

Page 95

1  equals the sales dollars in 2006, but I don't know if
2  that's Payco's sales to the trade or whether that's the
3  selling price of the products to Payco. There's nothing
4  that tells me that here.
5      Q. Okay.
6      MR. GILLES: I note it's 20 after 12:00.
7      MR. ZARLENGA: Want to break for lunch?
8      (Lunch recess.)
9      MR. GILLES: Q. Mr. Collette, I'd like to show
10 you an exhibit that we marked earlier, Exhibit 18 --
11     A. Um-hm.
12     Q. -- and direct your attention to the bottom part
13 of the exhibit. Specifically, I think, under 2002 there
14 is reference to in increase in the size of the container.
15     Do you see that?
16     A. Um-hm.
17     Q. Sir, you have to answer "yes."
18     A. Oh, I'm sorry. Yes.
19     Q. Thank you.
20     A. Got to get restarted.
21     Q. In terms of Dreyer's determination to convert the
22 half-gallon to a 56-ounce size, was that the subject of
23 some discussion within Dreyer's?
24     A. Yes. It's actually a decrease in size, not an
25 increase in size.

Page 96

1      Q. Oh, I misspoke. It's a decrease.
2      What -- was there a specific procedure that was
3  used to make the determination to decrease the size of the
4  half-gallon?
5      A. What do you mean by "a specific procedure"?
6      Q. Well, how did Dreyer's go about making that
7  decision?
8      A. That's consumer market driven. That's a very
9  large process.
10     Q. Could you explain it to me, please?
11     MR. ZARLENGA: I'm going to just object to the
12 question about changing the size of the package all across
13 the world as beyond of scope of the deposition notice.
14     THE WITNESS: The process was one that primarily
15 focused on consumer acceptance of a product in a
16 smaller-size container.
17     MR. GILLES: Q. What sort of market studies were
18 done to become informed of potential consumer reaction to
19 the change in container size?
20     MR. ZARLENGA: Same objection.
21     THE WITNESS: I don't have specific knowledge of
22 what exactly those studies were.
23     MR. GILLES: Q. How long a -- how long did the
24 process take to reach a determination to decrease the
25 container size?

Page 97

1      A. I don't know specifically how long it took.
2      Q. More than a year?
3      A. No, it did not take more than a year.
4      Q. Was there test marketing done to gauge consumer
5  acceptance?
6      A. Yes. I believe there was.
7      Q. What type of test marketing was performed?
8      A. I recall that we produced packages and sold them
9  in a market, a test market.
10     Q. And what observations did you make as a result of
11 the test marketing?
12     A. Well, when you say "what observations," can you
13 be more specific?
14     Q. What conclusions did you reach as a result of the
15 test market about consumers' acceptance of a decrease in
16 package size?
17     A. The company broadly reached a conclusion that
18 they could change the package size successfully.
19     Q. How did the company announce the change in
20 package size to its distributors?
21     A. They notified them that the packaging would
22 change at a certain point.
23     Q. And at the point in time that Dreyer's decreased
24 the package size, had its competitors decreased their --
25 the package size of comparable products?

WILLIAM COLLETTE

Page 98

1    A. I recall, yes, some of them had.
2    Q. So Dreyer's wasn't the first to decrease the
3  half-gallon size to 56 ounces?
4    A. No, I don't recall they were.
5    Q. Within Dreyer's organization at that time, who
6  made the final decision regarding the decrease in package
7  size?
8    A. I don't know who made the final decision.
9    Q. Who would have been involved in making that
10 decision?
11   A. Many, many people. I can't answer that question
12 specifically. Many people.
13   Q. I want to direct your attention to the next page
14 of the exhibit --
15   A. Um-hm.
16   Q. -- and specifically under the heading "2004," a
17 reference to the "June 28, Edy's is forced to reduce
18 support to $0.65 per unit due to raw material cost
19 increase."
20      Do you see that?
21   A. Yes, I do.
22   Q. What type of process was used to make the
23 determination to make that -- to reduce support to $0.65?
24   A. An analysis of the effect of increasing our raw
25 material prices, primarily dairy products, during that

Page 99

1  time.
2    Q. Were you involved in that decision?
3    A. Not involved in the decision directly. No, I was
4  not.
5    Q. At the time, were you aware of -- that a
6  consideration was being undertaken to reduce the support
7  price?
8    A. Yes, I was. Let me be very specific. You asked
9  me if I was aware that there was a consideration to reduce
10 the support price.
11      No, not specifically the support-price issue that
12 you're referring to here.
13   Q. Were you aware of the consequences of raw
14 material cost increases and what the company was going --
15 what actions the company was going to take in response to
16 that?
17   A. Broadly, yes.
18   Q. In terms of the reduction in the price support,
19 who would be involved in making that decision?
20   A. The people who were directly involved in the
21 distribution relationship.
22   Q. So that would be Mr. Nealis?
23   A. Mr. Nealis, Mr. Birchbauer, Mr. Frick.
24   Q. And do you know whether price -- the reduction in
25 support for -- strike that. Let me start again.

Page 100

1    Do you know whether there was a reduction in the
2  support price that was being paid to other independent
3  distributors made at that same time?
4    A. There were price increases that were invoked at
5  that time broadly on all products to all distributors. So
6  broadly, across Dreyer's products, Edy's products, Nestle
7  products to independent distributors.
8    Q. This is in 2004?
9    A. Correct.
10   Q. So for Sterling, the effect was a reduction in
11 the allowance of $0.65 per unit?
12   A. Correct.
13   Q. But I'm understanding you to say that for other
14 distributors at that time there was a different approach
15 taken.
16   A. For Payco there was an increase in the cost of
17 certain products.
18   Q. How was the determination made to reduce
19 Sterling's support price by $0.10? I mean, how did you
20 arrive at that particular number?
21   A. Well, broadly, that was a determination made by
22 those who were directly responsible in consideration of
23 all of the factors around the market price of the product
24 and the effect -- potential effect on sales in the market.
25   Q. Now, was -- in terms of responding to the raw

Page 101

1  material cost increases, was a particular person within
2  the Dreyer's organization in 2004 assigned to undertake a
3  study of that question and develop recommendations with
4  respect to how to address it?
5    A. No, not a particular person.
6    Q. Was it a group of people?
7    A. Broadly, there would be a lot of people involved
8  in that kind of a discussion.
9    Q. I mean, there would have been any number of
10 different alternatives that Dreyer's could have taken with
11 respect to the increase in raw material costs beyond just
12 decreasing the price supports, right?
13   A. I'm sorry. Restate that for me?
14   Q. There were other alternatives to -- available
15 beyond a reduction in the price support to Sterling to
16 deal with increasing raw material costs, right?
17   A. Yes. Could have increased the list price.
18   Q. And -- well, were not various alternatives
19 considered by Dreyer's at that time before selecting the
20 reduction in the allowance?
21   A. Were they not considered for -- specifically for
22 what?
23   Q. Well, instead of -- did you consider something
24 beyond reducing the allowance per unit item as a way to
25 recover the increased cost of raw materials?

WILLIAM COLLETTE

Page 102

1    A. I don't know if there were specific
2 considerations or alternatives for Sterling considered. I
3 don't have knowledge of that.
4    Q. Now, in 2004 would have this determination been
5 made -- would someone at Vevey in Switzerland had
6 input into this determination?
7    A. No.
8    Q. You recall one of the first exhibits we looked at
9 referred to an e-mail from Thomas Ward in 2003?
10    A. You're going to have to refresh my memory here.
11    Q. I will.
12    A. We've seen a few documents from him.
13    Q. I'm showing you what's marked as Exhibit 5. The
14 first sentence refers to an e-mail from Mr. Ward to
15 Mr. Sadurni.
16    A. Sadurni, um-hm, yes, it does.
17    Q. On various -- strike that.
18        Is it possible that Mr. Ward's e-mail regarding
19 his observations about the distribution in Puerto Rico was
20 a factor in increasing the price to Sterling in 2004?
21    A. I'm not sure what Mr. Ward was thinking about. I
22 can't speculate on what Mr. Ward was thinking about.
23    Q. So you wouldn't have any information that
24 communications from Mr. Ward or someone else might have
25 affected Dreyer's decision to increase or to decrease the

Page 103

1 allowance to Sterling in 2004?
2    A. No, I would not have any information that that
3 would be the case.
4    Q. Does, or has Dreyer's -- strike that.
5        Has Dreyer's undertaken market studies to
6 identify brand loyalty of its customers?
7    A. Yes, broadly.
8    Q. And what -- what has it done to investigate that?
9    A. Conducted market studies that are designed to
10 determine brand loyalty for certain brands, certain
11 markets.
12    Q. When -- how often has Dreyer's undertaken that
13 effort, such an effort?
14    A. Periodically.
15    Q. Within the last five years?
16    A. I don't have specific knowledge of when. But
17 yes, I'm sure they have.
18    Q. Can you describe to me how a particular study is
19 structured to investigate that matter?
20    A. Not specifically as to methodology, no.
21    Q. Well, generally?
22    A. Generally, a brand loyalty study
23 determines what percentage of an individual's or
24 household's total consumption of a particular product is
25 consumed -- or, excuse me, is to one particular brand.

Page 104

1    Q. Is that done via a customer survey?
2    A. Not -- well, not specifically. Typically it's
3 done on a commission basis from some firm that studies
4 that kind of behavior.
5    Q. So Dreyer's would engage a consulting firm or a
6 marketing firm, some independent firm to conduct such a
7 study?
8    A. To collect the data for such a study, yes.
9    Q. Has Dreyer's used any particular firms
10 consistently during the last five years?
11    A. I don't have that knowledge. I'm not aware of
12 that.
13    Q. Who would know that?
14    A. I don't -- I can't tell you who specifically
15 would know that at Dreyer's, but --
16    Q. Who would you call to find out who would know
17 that?
18    A. I would call someone at Dreyer's.
19    Q. Who?
20    A. In the marketing group.
21    Q. And who? Who would that be?
22    A. I think it would probably depend on the brand
23 that I was interested in.
24    Q. Say Edy's.
25    A. I would call the Edy's brand manager to ask them.

Page 105

1    Q. And who is that?
2    A. At this point in time, I'm not aware of who the
3 Edy's brand manager is.
4    Q. There is an individual whose job title is Edy's
5 brand manager?
6    A. Not specifically. There would be an individual
7 whose job title is something around packaged ice cream
8 brand or something of that nature.
9    Q. So his or her title would be what?
10    A. Something like that, manager of packaged ice
11 cream brand, something of that nature. I'm not actually
12 sure.
13    Q. Have you seen reports that have analyzed -- that
14 have resulted from this type of study?
15    A. Have I -- oh, yes, sure.
16    Q. Would you describe them to me?
17    A. I have seen reports periodically over the last
18 20 years, so I need a little more specific direction.
19    Q. Describe one in the last five years that
20 attempted to analyze customer brand loyalty to Edy's.
21    A. That -- that study would simply state as a
22 percentage what percentage of total typically household
23 requirement for ice cream was allocated to Edy's.
24    Q. Would it be a multipage document?
25    A. I would have only seen summaries of that. I'm

27 (Pages 102 to 105)

WILLIAM COLLETTE

Page 106

1  sure that there was something, but I would see summaries.
2  I've seen summaries.
3    Q. Does Dreyer's keep the studies that it's done
4  over time so it can understand how people's behavior may
5  be changing?
6    A. I'd have to speculate. I'm not sure exactly what
7  the retention policy is around those kind of documents.
8    Q. Do you know what the retention policy is of
9  documents obtained from ACNielsen or IRI?
10   A. No, I don't, not specifically.
11   Q. I'd like to direct your attention to the impulse
12  market or novelty market.
13   A. Okay.
14   Q. Has Dreyer's -- what do you understand by "the
15  impulse market"?
16   A. Are you asking me broadly what is --
17   Q. Yeah. Um-hm.
18   A. -- an impulse product?
19   Q. Yes.
20   A. It's a product that is typically a novelty
21  product that is purchased in other than a grocery store.
22   Q. Usually available, say, at a checkout in a
23  freezer where someone can select a single item to consume
24  at that point in time?
25   A. Could be.

Page 107

1    Q. Could be? Could be.
2       Does -- for Sterling, does Dreyer's provide any
3  direct support of impulse product marketing?
4    A. You have to be a little more specific. I don't
5  know what you mean by "direct support of impulse
6  marketing."
7    Q. Does it provide payments for or freezers for
8  displaying impulse products?
9    A. I'm not sure of the impulse marketing program
10  with Sterling. I'm not aware of it at that level of
11  detail.
12   Q. What about with respect to other distributors?
13   A. Other distributors?
14   Q. Other than Sterling.
15   A. Oh, I'm not aware of the specific way that's
16  conducted at the distributor level.
17   Q. Does Dreyer's have or has Dreyer's done marketing
18  studies with respect to the sale of novelty items in the
19  impulse market?
20   A. Broadly?
21   Q. Yes.
22   A. Yes.
23   Q. And what's been the focus of the studies?
24   A. You have to be a little more specific. When you
25  say "focus," what do you mean?

Page 108

1    Q. What do the studies try and investigate?
2    A. Well, the studies could investigate either
3  products or venues or occasions, one of those things.
4    Q. Has Dreyer's identified the type of locations
5  that are best suited for this sort of sales effort?
6    A. Dreyer's would have identified a range of
7  locations, not a best location.
8    Q. And in terms of the type of product that are
9  offered at those locations, what sort of studies has
10  Dreyer's undertaken to make that determination?
11   A. Product development studies.
12   Q. What's involved in the --
13   A. Process. I shouldn't even call it a study. It's
14  a process.
15   Q. What's involved in the product development
16  process?
17   A. Product development process would match up
18  product forms to the occasion in such a way that you have
19  the highest probability of a product that's going to be in
20  demand at one or more locations.
21   Q. Are -- is that type of study ongoing at Dreyer's?
22   A. Product development is an ongoing process in
23  consumer products broadly.
24   Q. And continues to be -- I mean, Dreyer's continues
25  with that effort?

Page 109

1    A. Yes.
2    Q. With respect to -- going back to grocery store
3  and take-home products, 56-ounce products or pints, are
4  you familiar with slotting, the payment of slotting fees
5  to retailers?
6    A. Yes.
7    Q. Does -- how does that -- what do you understand
8  by that?
9    A. Slotting is an initial fee charged by a retailer
10  to authorize the delivery and placement of a product on
11  its shelf and to authorize that product -- certain SKUs of
12  that product to be sold and scanned in the retailer
13  system.
14   Q. Is it -- does Dreyer's reimburse -- has Dreyer's
15  reimbursed Sterling for the payment of slotting fees?
16   A. I'm not aware specifically of the arrangement
17  with Sterling with regard to slotting fees.
18   Q. Has Dreyer's reimbursed Payco with respect to the
19  payment of slotting fees?
20   A. I'm not aware of that specific level with Payco,
21  either.
22   Q. Are there any other payments other than slotting
23  fees that are paid to retailers by Dreyer's for placement
24  of its product?
25   A. I'm not aware of other payment.

WILLIAM COLLETTE

Page 110

1    Q. Pay-to-stay fees?  Does that -- do you have an
2  understanding of that term?
3    A. That's a jargon.  Yeah, that's jargon.
4    Q. It's not something specific that you're aware of
5  that Dreyer's would reimburse distributors for?
6    A. I'm not specifically aware.  Depends -- again,
7  I'm not aware of that with respect to Sterling.
8    Q. Going back to exhibit, I believe it's 18 --
9    A. This one?
10   Q. Yes.
11      -- on the second page, under 2005, it says that
12  Edy's will support Sterling at $0.60 per unit, correct?
13   A. Yes.
14   Q. And then there's a note plus and three bullet
15  points:  10,000 light demo support, 5,000 Dibs demo
16  support, 5,000 other demo support.
17      Can you explain that to me?
18   A. Those were additional fees -- not fees, that's
19  the wrong word.  Additional funds provided to Sterling for
20  the support of each of those respective products and the
21  marketing of each of those respective products at the
22  consumer level.
23   Q. And that's $10,000 in total for the calendar year
24  2005?
25   A. I'm not -- I'm not sure exactly that that's how

Page 111

1  this is structured.  It just appears under the caption
2  that way.
3    Q. Do you know if -- what the Edy's support was for
4  Sterling in 2006 in terms of the allowance?
5    A. No, I'm not aware of that.
6    Q. Earlier this morning I asked you about a meeting
7  in February 2004 or March 2004 between executives from
8  Dreyer's and Nestle, and I think I mentioned Mr. Silva.
9      In addition to Mr. Silva or beyond that, are you
10  aware of any meeting with a Mr. Represas between Dreyer's
11  executives and Mr. Represas regarding the Puerto Rican
12  market in February or March of 2004?
13   A. No.
14   Q. Did you inquire about whether or not any such
15  meetings took place during that time period?
16   A. The reference to that meeting was in a Payco
17  document and was referring to people outside of Dreyer's,
18  so I had no -- no one to whom I could inquire about that
19  meeting at Dreyer's.
20   Q. Does Dreyer's -- and earlier we looked at the --
21  directing your attention to Exhibit 10, and specifically a
22  page from the PowerPoint that's Dreyer's 2371 that has the
23  heading "Puerto Rico," and I directed your attention
24  earlier to confusing brand alliances between primary --
25  does it say between distributors?

Page 112

1      Does Dreyer's have any plans currently to deal
2  with that problem in the future?
3      MR. ZARLENGA:  Object to the form of the
4  question, to the extent it lacks proper foundation.
5      MR. GILLES:  I'll withdraw the question and
6  reframe it.
7    Q. That was a topic of discussion at a meeting that
8  occurred in 2004, correct?
9    A. I'm not aware of the meeting you're referring to.
10   Q. Well, the document itself is attached to a series
11  of e-mail that refer to a meeting that was to occur in
12  Puerto Rico in -- I believe it's September of 2004.
13   A. No.
14   Q. What --
15   A. The document refers to -- the document is a
16  document dated September 8, 2003.
17   Q. I'm sorry.  Thank you.  2003.
18      And it refers to a meeting in Puerto Rico -- a
19  meeting that's scheduled in Puerto Rico?
20   A. Scheduled, yeah.
21   Q. In September of 2003?
22   A. Um-hm.
23   Q. Correct?
24   A. Yes, I believe that's what the first page refers
25  to.

Page 113

1    Q. And on the page that's in front of you, 2371,
2  Dreyer's 2371, one of the bullet points is "confusing
3  brand alliances between primary distributors," correct?
4    A. Yes.
5    Q. And you don't -- as we sit here today, you don't
6  know whether that was discussed -- whether or not a
7  meeting even took place in Puerto Rico in September
8  of 2003?
9    A. That's correct.
10   Q. Did you attempt to seek out someone within
11  Dreyer's who might have knowledge of that meeting in order
12  to prepare for today's deposition?
13   A. The people who would beware of that meeting are
14  no longer at Dreyer's.
15   Q. But this morning we talked about the -- this
16  topic as dealing with the situation in Puerto Rico where
17  Sterling distributes Edy's and Ben & Jerry's.
18   A. Right.
19   Q. And Edy's is manufactured by Dreyer's and
20  Ben & Jerry's is manufactured by Unilever, correct?
21   A. Correct.
22   Q. Unilever is Nestle's competitor, correct?
23   A. Correct.
24   Q. And Payco, Nestle's distributor in Puerto Rico,
25  distributes Haagen-Dazs and Nestle, correct?

29 (Pages 110 to 113)

WILLIAM COLLETTE

Page 114

1      A.  No.  Haagen-Dazs and Breyers.
2      Q.  And Breyers are manufactured by
3  Unilever, which is Nestle's competitor.
4      A.  Correct.  And Haagen-Dazs in the international
5  market is a brand that is controlled by General Mills.
6      Q.  So my question is whether or not this situation
7  where Nestle in effect is distributing a product that it
8  doesn't manufacture and in fact is manufactured by a
9  competitor, whether you're aware of any plan or business
10  strategy to address that issue.
11      A.  I'm not -- I don't have that information.  No,
12  I'm not aware of that.
13      Q.  In reviewing the documents, at least in 2003 --
14      A.  Right.
15      Q.  -- there were references to overtures by Nestle
16  to Sterling to -- relative to a transaction that would
17  result in potentially acquiring Sterling's business
18  operations, correct?
19      MR. ZARLENGA:  I'll object to the form of the
20  question as lacking proper foundation.
21      THE WITNESS:  There are documents in there that
22  would suggest that.
23      MR. GILLES:  Q.  And you don't know whether
24  any -- what happened with respect to those particular
25  discussions?

Page 115

1      A.  No.  That's correct.
2      Q.  And from a -- just a second.
3      I just want to make sure -- I want to direct your
4  attention again to Exhibit 10, and this time to 2004 --
5      A.  Um-hm.
6      Q.  -- and the $0.05 price reduction that occurred
7  during that time period -- at that time.
8      A.  That's not what's stated here, but -- I'm sorry.
9      Q.  That's a $0.05 price -- $0.10.  The $0.05 price
10  reduction occurred in 2005, right?  I'm sorry, I misspoke.
11      The first bullet point under 2005 refers to the
12  allowance at a level of $0.60 per unit?
13      A.  The price support for 2005 was set at $0.60 per
14  unit.
15      Q.  Right, and that's $0.05 less than had been set
16  the previous year?
17      A.  Yes, than had been implemented in June of the
18  previous year, that's correct.
19      Q.  So at that time in -- when that went into effect
20  in January of 2005 --
21      A.  Um-hm.
22      Q.  -- were there corresponding price adjustments for
23  other independent distributors?
24      A.  Yes.
25      Q.  And how were those implemented?

Page 116

1      A.  As corresponding price increase.  There's a list
2  price increase to Payco of approximately 7 percent.
3      Q.  How is it that Dreyer's -- or what explains the
4  determination to change the price support to Sterling and
5  raise the price -- list price to Payco?
6      A.  There had a different historic pricing
7  relationship or relationship with Sterling, so their
8  historic manner of providing support to Sterling was
9  through a promotional price support.
10      Q.  Okay.  And I noticed that earlier today we had
11  one document that was an e-mail chain that described
12  pricing for Dibs.
13      A.  Yes.
14      Q.  Do you recall that?
15      A.  Yes, generally.
16      Q.  And have you seen in your preparation for today
17  any comparable document that would relate to the
18  determination in -- to increase or to decrease the
19  allowance in 2004 to $0.60 per unit?
20      A.  I'm sorry.  I don't understand what you mean by
21  that.
22      Q.  Well, there was a price decrease that went into
23  place -- the price -- the allowance decrease that went
24  into effect in January 2005 --
25      A.  Correct.

Page 117

1      Q.  -- was $0.05, correct?
2      A.  Right.
3      Q.  Have you seen any documents that would set out
4  the -- a decision to make that price reduction?
5      A.  I don't recall specifically a document that sets
6  out the price reduction.
7      Q.  Wouldn't you expect to find some documents within
8  Dreyer's organization that would reflect the determination
9  to make a reduction in the allowance?
10      A.  Not specifically as you've stated it, no.  I
11  wouldn't necessarily expect to find that, no.
12      Q.  It would all be as a result of personal
13  interaction among Dreyer's employees that the decision
14  would be made to -- without any written or documentary
15  record of the determination to change the allowance?
16      A.  As a matter of annual process that you earlier
17  described, making a plan for the succeeding year, a
18  determination of independent distributor prices would have
19  been part of that process, and that would not have been in
20  the form that you describe it.
21      Q.  What form would it have taken?
22      A.  Just simply as a part of the planning process,
23  and there would be discussion at the -- with the
24  independent distributors around that.
25      MR. GILLES:  Okay.  Mr. Collette, I don't have

WILLIAM COLLETTE

Page 118

```
1   any more questions, thank you.
2        MR. ZARLENGA:  I don't have any questions.
3        THE REPORTER:  Would you like a copy of this
4   transcript?
5        MR. ZARLENGA:  Yeah, I suppose, sure.
6
7        (Proceedings concluded at 2:01 p.m.)
8
9
10              -0-
11
12       I have read the foregoing deposition transcript
13  and by signing hereafter, approve same.
14
15  Dated_____.
16
17           _____
                    William Collette
18
19
20
21
22
23
24
25
```

WILLIAM COLLETTE

# EXHIBIT D

# David Gilles - RE: meet & confer

| | |
|---|---|
| **From:** | "Zarlenga, Carmine" <ZarlengaC@howrey.com> |
| **To:** | David Gilles <Dgilles@gklaw.com> |
| **Date:** | 5/29/2008 5:12 PM |
| **Subject:** | RE: meet & confer |
| **CC:** | "Luis A. Oliver" <loliver@fgrlaw.com>, "Koons, Erik" <KoonsE@howrey.com>, "Seth A. Erbe" <seth.erbe@indianowilliams.com> |

I should be to your office between 9:30 am and 10 am if my flights are on time.

---

**From:** David Gilles [mailto:Dgilles@gklaw.com]
**Sent:** Thursday, May 29, 2008 5:35 PM
**To:** Zarlenga, Carmine
**Cc:** Luis A. Oliver; Koons, Erik; Seth A. Erbe
**Subject:** RE: meet & confer

Carmine,

While I disagree with your characterization of the burdensomeness of Document Request No. 6, I appreciate and accept your offer and agree to limit the request accordingly.

I respectfully decline your request to withdraw Document Request No. 5. Plaintiff has made good faith efforts to narrow the scope of this request. I do not believe that seeking responsive documents from 75 employees amounts to a burden that would excuse production of documents. While you may disagree, plaintiff regards the information sought in this request to be significant and relevant.

I believe that reasonable steps can be taken to minimize the burden on 75 marketing employees. I am not familiar with the organization or internal procedures such that I am in a position to offer meaningful suggestions to limit the burden. Nonetheless, should some measures occur to you, I remain willing to discuss same.

Please advise me what time you would like to meet tomorrow.

Dave


David J. Gilles
Attorney
Godfrey & Kahn
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719

608-284-2219 tel
608-257-0609 fax
608-219-1892 cell

"Pursuant to Circular 230 promulgated by the Internal Revenue Service, if this email, or any attachment hereto, contains advice concerning any federal tax issue or submission please be advised that it was not intended or written to be used, and that it cannot be

used, for the purpose of avoiding federal tax penalties unless otherwise expressly indicated."

**This is a transmission from the law firm of Godfrey & Kahn, S.C. and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges. If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this transmission in error, please destroy it and notify us immediately at our telephone number (414) 273-3500 .**

>>> "Zarlenga, Carmine" <ZarlengaC@howrey.com> 5/29/2008 3:32 PM >>>
Dave:

Following receipt of your last e-mail, we have conferred with our client and provide the following update and offer of compromise:

**Document Request No. 6**: We have confirmed with DreyerÃ‚'s that there is no central custodian or custodians who maintain(s) market studies and / or reports obtained from Nielsen, IRI, or other such third-party companies. Nor is there a central file or repository where such data is maintained. Rather, virtually all of the approximately 75 marketing employees in DreyerÃ‚'s Oakland offices have access to online accounts with access to such companiesÃ‚,' services. Based on our discussion yesterday, you are under a misapprehension about the nature of Neilsen and IRI data. The Company does not receive "reports" and few employees print or save Ã‚,"reports.Ã‚,"  Instead, most employees who access this data simply view it on the computer in real time. While it is possible that the rare employee printed and saved a Ã‚,"reportÃ‚," in his or her personal hard-copy or electronic files, determining same would require a search of virtually every paper and electronic document maintained by at least 75 employees. We have also confirmed that these on-line services do not save queries, searches, or reports that might have been run / accessed.

On rare occasions, some employees have saved Ã‚,"reportsÃ‚," on an internal shared computer drive. Although we have confirmed that there are some such Ã‚,"reportsÃ‚," on this shared drive, we are unaware of the volume of this data, and whether it relates EdyÃ‚,'s ice cream take home brands. To search for it will be burdensome as the computer drive contains numerous folders and subfolders. It is NOT something that can easily be done with the push of a button, but will take time. We maintain that the data sought by this Request is not relevant and not likely to lead to the discovery of admissible evidence, and that the Request is overbroad and unduly burdensome. This burden is exacerbated by the fact that the information sought is publicly available and thus, it is far easier for Sterling to obtain the specific data it purportedly needs for its expert reports than it is for DreyerÃ‚,'s to extensively search through at least 75 of its employeesÃ‚,' hard-copy and electronic files for generalized market Ã‚,"reportsÃ‚," covering the whole United States in the hope that maybe something will be found.

Nonetheless, in the spirit of compromise, we are offering to produce Ã‚,"[m]arket studies and reports from A.C. Nielsen, New York, NY, Information Resources, Inc. (IRI), Chicago, IL, and other companies regarding the promotion and sale of EdyÃ‚,'s ice cream . . .Ã‚," located on DreyerÃ‚,'s shared computer drive for the period January 1, 2003 to December 31, 2006 (date restriction as stated in your email of today). I am reluctant to even offer this compromise because I truly believe this discovery request is far beyond the realm of reasonable discovery in a case where the plaintiff has alleged a relevant geographic market of Puerto Rico only. I do not understand why my client should have to take an expensive and burdensome search when your client can access the Neilsen and IRI information and get access to whatever data that may be there.

**Document Request No. 5**: SterlingÃ‚,'s Request No. 5, even if limited the Oakland Marketing division and for the four-year period from January 1, 2003 to December 31, 2006, is extremely overbroad and unduly burdensome based on specific discussions we have had with our client.

SterlingÃ‚,'s Request No. 5 would require DreyerÃ‚,'s to search through both the paper **and** electronic files of approximately 75 employees. As for electronic records, each of these 75 employees maintains electronic

records in **at least** the form of: (i) an email account on the DreyerÃ,'s server; (ii) personal or .pst files; (iii) data saved on the employeesÃ,' individual hard drive; and (iv) data saved in a shared computer drive. Within the shared drive, there are approximately fifty (50) different shared folders. In addition to the foregoing, each of these 75 employees has an individual folder on the DreyerÃ,'s server to save electronic data (separate and apart from the shared drive). There is also no standard for labeling documents at DreyerÃ,'s. As such, searching for the information sought in Request No. 5 would require DreyerÃ,'s to open virtually every electronic file to determine Ã,"responsivenessÃ," (including verifying the date of each document and the substantive content). The discussions that we have had regarding the foregoing request have not materially mitigated the extreme burden that the Request would impose on DreyerÃ,'s.

Moreover, Sterling has alleged that: (i) the relevant geographic market is limited to Ã,"the Commonwealth of Puerto RicoÃ," and possibly Ã,"narrower submarkets;Ã," and (ii) the alleged requirement to maintain a DSD system in Puerto Rico distinguishes the Puerto Rico market from Ã,"most distribution markets.Ã," (Amended Complaint paras. 14, 15.) As such, the information sought by this request -- market research reports and analyses for the U.S. mainland -- is not relevant to any allegations in SterlingÃ,'s Amended Complaint, nor is it likely to lead to the discovery of admissible evidence. (As you know, DreyerÃ,'s has already produced documents responsive to Request No. 5 and 6 relating to Puerto Rico.)

As such, in its current form, DreyerÃ,'s cannot agree to search for or produce additional documents (beyond those that it has already produced regarding the Puerto Rico market) sought by Request No. 5. I urge you to withdraw that request given the foregoing information. I do not make this request lightly. Dreyers has been more than reasonable in discovery thus far, incurring great expense. When you sought relevant materials, we produced them. Several witnesses were made available for deposition. But with all due respect, this request is too burdensome especially when its dubious relevancy is taken in to account. Let me know if you will agree as soon as you can. Otherwise, we will have to meet in person tomorrow per the Court Order.

*Carmine R. Zarlenga*
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 383-7046
zarlengac@howrey.com
http://www.howrey.com

---

**From:** David Gilles [mailto:Dgilles@gklaw.com]
**Sent:** Thursday, May 29, 2008 12:18 PM
**To:** Zarlenga, Carmine
**Cc:** Luis A. Oliver; Koons, Erik; Seth A. Erbe
**Subject:** RE: meet & confer

Carmine,

Regarding Doc. Req. # 5, yesterday I understood you to say that you found the language in the request to be unclear and vague (among other concerns). I disagreed, but offered to provide further explanation of what I regarded as responsive to the request. I believe that market reports, studies and analysis (as outlined in my email below) regarding customer behavior - whether undertaken by Dreyers or obtained from other sources - are responsive to the request.

We will narrow the request to this type of market research; as a consequence the terms "product concept, media plans, market segmentation, ...and other market analysis" can be stricken from the Request.

2. No. Again, my earlier email was an attempt to provide further explanation of what I regard as responsive to the request; it was not intended to expand the scope of the request.

David J. Gilles
Attorney
Godfrey & Kahn
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719

608-284-2219 tel
608-257-0609 fax
608-219-1892 cell

"Pursuant to Circular 230 promulgated by the Internal Revenue Service, if this email, or any attachment hereto, contains advice concerning any federal tax issue or submission, please be advised that it was not intended or written to be used, and that it cannot be used, for the purpose of avoiding federal tax penalties unless otherwise expressly indicated."

**This is a transmission from the law firm of Godfrey & Kahn, S.C. and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges.  If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this transmission in error, please destroy it and notify us immediately at our telephone number (414) 273-3500 .**

>>> "Zarlenga, Carmine" <ZarlengaC@howrey.com> 5/29/2008 10:27 AM >>>
Dave:

I am not clear on your proposal as follows:

1  What about the language in Doc. Req. #5 referring to "syndicated research and other marketing analysis and data purchased from third parties,...market simulation, product concept, media plans, market segmentation, price elasticity, ...and other market analyses..."  Are you dropping out those items in favor of what you have set forth below?

2.  Also, are you replacing the key qualifier "regarding ice cream products (including Edy's)" with "regarding consumer behavior?"

Please clarify if you can.

*Carmine R. Zarlenga*
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

(202) 383-7046
zarlengac@howrey.com
http://www.howrey.com

---

**From:** David Gilles [mailto:Dgilles@gklaw.com]
**Sent:** Thursday, May 29, 2008 10:48 AM
**To:** Zarlenga, Carmine
**Cc:** Luis A. Oliver; Koons, Erik; Seth A. Erbe
**Subject:** meet & confer

Carmine,

Per our conversation yesterday, please be informed as follows:

Request No. 5 seeks market research, reports or analysis regarding customer behavior with respect to the purchase of Edys take home ice cream products such as

- customer response to price changes;
- customer purchase decision process;
- customer brand loyalty;
- customer response to temporary price reductions;
- customer response to in-store promotions.

In addition, the request includes market research, reports or analysis of retail scan data to evaluate price elasticity.

In addition to the limitations in my March 21, 2008, letter, plaintiff agrees to limit these requests to documents maintained by Dryer's Marketing Division and not extend to regional offices throughout the country. The time period for these requests is January 1, 2003 to December 31, 2006.

In the event we are not able to reach agreement, please advise me when you would like to meet and confer in person tomorrow.

Regards,

Dave

David J. Gilles
Attorney
Godfrey & Kahn
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719

608-284-2219 tel
608-257-0609 fax
608-219-1892 cell

"Pursuant to Circular 230 promulgated by the Internal Revenue Service, if this email, or any attachment hereto, contains advice concerning any federal tax issue or submission, please be advised that it was not intended or written to be used, and that it cannot be used, for the purpose of avoiding federal tax penalties unless otherwise expressly indicated."

**This is a transmission from the law firm of Godfrey & Kahn, S.C. and may contain information which is privileged, confidential, and protected by the attorney-client or attorney work product privileges.  If you are not the addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this transmission in error, please destroy it and notify us immediately at our telephone number (414) 273-3500 .**

-----------------------------------------------------------------------------------------------

This email and any attachments contain information from the law firm of Howrey LLP, which n confidential and/or privileged. The information is intended to be for the use of the individual o named on this email. If you are not the intended recipient, be aware that any disclosure, copy distribution or use of the contents of this email is prohibited. If you receive this email in error, please notify us by reply email immediately so that we can arrange for the retrieval of the orig documents at no cost to you. We take steps to remove metadata in attachments sent by emai remaining metadata should be presumed inadvertent and should not be viewed or used witho permission. If you receive an attachment containing metadata, please notify the sender imme replacement will be provided. Howrey LLP consists of two separate limited liability partnership formed in the United States (Howrey US) and one formed in the United Kingdom (Howrey UK) registered in England and Wales under number OC311537 and regulated by the Solicitors Reg (http://www.sra.org.uk/code-of-conduct.page). HowreyÃf¢?
Ts London and Paris offices are operated as part of
Howrey UK. A list of the partners of Howrey UK is available for inspection at its registered offi Tudor Street, London EC4Y 0AY. A consolidated list of all Howrey US and Howrey UK attorney jurisdictions where they are authorized to practice and/or are registered can be obtained by co emailrequest@howrey.com.

-----------------------------------------------------------------------------------------------


-----------------------------------------------------------------------------------------------

This email and any attachments contain information from the law firm of Howrey LLP, which n confidential and/or privileged. The information is intended to be for the use of the individual o named on this email. If you are not the intended recipient, be aware that any disclosure, copy distribution or use of the contents of this email is prohibited. If you receive this email in error, please notify us by reply email immediately so that we can arrange for the retrieval of the orig documents at no cost to you. We take steps to remove metadata in attachments sent by emai remaining metadata should be presumed inadvertent and should not be viewed or used witho permission. If you receive an attachment containing metadata, please notify the sender imme replacement will be provided. Howrey LLP consists of two separate limited liability partnership formed in the United States (Howrey US) and one formed in the United Kingdom (Howrey UK) registered in England and Wales under number OC311537 and regulated by the Solicitors Reg

(http://www.sra.org.uk/code-of-conduct.page). HowreyÃ¢?
Ts London and Paris offices are operated as part of
Howrey UK. A list of the partners of Howrey UK is available for inspection at its registered offic
Tudor Street, London EC4Y 0AY. A consolidated list of all Howrey US and Howrey UK attorney:
jurisdictions where they are authorized to practice and/or are registered can be obtained by cc
emailrequest@howrey.com.
-----------------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------------
This email and any attachments contain information from the law firm of Howrey LLP, which n
confidential and/or privileged. The information is intended to be for the use of the individual o
named on this email. If you are not the intended recipient, be aware that any disclosure, copy
distribution or use of the contents of this email is prohibited. If you receive this email in error,
please notify us by reply email immediately so that we can arrange for the retrieval of the orig
documents at no cost to you. We take steps to remove metadata in attachments sent by emai
remaining metadata should be presumed inadvertent and should not be viewed or used withou
permission. If you receive an attachment containing metadata, please notify the sender imme
replacement will be provided. Howrey LLP consists of two separate limited liability partnership:
formed in the United States (Howrey US) and one formed in the United Kingdom (Howrey UK)
registered in England and Wales under number OC311537 and regulated by the Solicitors Reg
(http://www.sra.org.uk/code-of-conduct.page). Howreyâ?Ts London and Paris offices are oper
Howrey UK. A list of the partners of Howrey UK is available for inspection at its registered offic
Tudor Street, London EC4Y 0AY. A consolidated list of all Howrey US and Howrey UK attorney:
jurisdictions where they are authorized to practice and/or are registered can be obtained by cc
emailrequest@howrey.com.
-----------------------------------------------------------------------------------------------------

# EXHIBIT E



ONE EAST MAIN STREET
POST OFFICE BOX 2719
MADISON, WI 53701-2719
TEL 608-257-3911
FAX 608-257-0609
www.gklaw.com

Direct: 608-284-2219
dgilles@gklaw.com

March 21, 2008

**VIA E-MAIL KOONSE@HOWREY.COM**

Erik T. Koons
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2402

  RE: Sterling Merchandising, Inc. v. Nestlé, S.A. et al.
     U.S. District Court, District of Puerto Rico, Case No. 06-CV-1015
     File No.: 080369-0001

Dear Mr. Koons:

  I am writing to confirm our March 21, 2008, discussions regarding Dreyer's response to Sterling's subpoena and my December 21, 2007, letter to Mr. Zarlenga.

  In an attempt to resolve concerns outlined in my letter to Mr. Zarlenga, we discussed Sterling's position that Dreyer's document production and Mr. Collett's preparation were deficient with regard to document Request Nos. 5 and 6 and Deposition Topic Nos. 8, 9, and 11 and Dreyer's objections and concerns regarding same.

  As a result of our discussion, I agreed to limit the scope of these requests to marketing reports and analysis regarding Edy's brand products, but declined to adopt geographic limitations.  I also indicated that these requests related to the final reports and analysis and did not seek underlying data, correspondence or email.

  Finally, I agreed to consider further reasonable limitations in the event responding to these requests posed specific concerns for particular responsive information.

  I understand that you will be considering this further and advise me of Dreyer's position in the near future.

       Very truly yours,

       GODFREY & KAHN, S.C.

       David J. Gilles

DJG:kap
cc: Seth A. Erbe
  Carmine R. Zarlenga
  Luis A. Oliver